C. E. Bosserman, Administrator, Plaintiff Appellant, v. Nellie Watson, Appellee; C. E. Bosserman, Administrator, Intervenor Appellant.

No. 44798.

JUNE 17, 1941.

REHEARING DENIED JANUARY 16, 1942.

McMartin, Herrick, Sloan & Langdon, for appellants.

O. M. Slaymaker and D. D. Slaymaker, for appellee.

WENNERSTRUM, J.—This case has heretofore been before this court, an opinion having been filed affirming the lower court which held that there had been an inter vivos gift of certain bonds to the defendant. The former opinion has been published ·in 287 N. W. 845. A petition for rehearing was granted. The writer of the present opinion was not a member of this court at the time of the original submission of this case or of the petition for rehearing. By reasons of the conclusions hereinafter announced, the original opinion is herewith withdrawn and this opinion is substituted in lieu thereof.

Milo Remington, and his two sisters Cora and Etta Remington, had been residents of Murray, Iowa for a number of

years. About 1925 they moved to an acreage about one-half mile west of Murray where they lived until the time of their death. The sisters never married. Cora died January 24, 1933 at the age of 66. Milo died testate on January 5, 1937 at the age of 72 years, and Etta died on January 10, 1937, and at the time of her death was 74 years of age.

The litigation in connection with this case has developed by reason of the question arising as to whether or not there was a gift of certain bonds in the amount of $21,000 to the defendant by the decedent, Milo Remington, during his lifetime.

C. E. Bosserman, administrator, with will annexed, of the estate of Milo Remington brought the present action in equity claiming that at the time of the death of Milo Remington he was the owner of $14,000 in school bonds and that also at the time of his death the said Milo Remington was the acting executor of the estate of Cora Remington, deceased, and as such executor had in his possession, as assets of the Cora Remington estate, bonds in the amount of $7,000. It is the contention of the plaintiff that the bonds in controversy are the property of the estate of Milo Remington. The defendant, by way of answer, states that all the bonds involved in the present case were given to her by the decedent, Milo Remington, prior to his death. Defendant further contends that she has been the owner thereof since that time and that said bonds were given to her in appreciation of many kind services that she had done for the decedent.

There was a petition of intervention filed by the administrator with will annexed of the estate of Cora Remington in which it was alleged that at the time of the death of Cora Remington she was the owner of $7,000 in bonds. It is further alleged that Milo Remington, brother of the decedent, Cora Remington, and executor of her estate, had possession of the $7,000 in bonds and that these bonds came into the possession of the defendant, Nellie Watson, but that the same continued as the property of the estate of Cora Remington.

The allegations of the petition of intervention are denied by the defendant.

In connection with the intervenor's appeal the record discloses that at the time this case was tried in the lower court,

which commenced March 4, 1938, the estate of Cora Remington had been pending since April 5, 1933. It was further shown that there had been no claims filed against the estate and that there was no indebtedness due anyone from the estate. The evidence further discloses that the assets of this estate had been divided and that in the division between the two beneficiaries, Milo Remington and Etta Remington, the seven bonds claimed by the intervenor were assigned to Milo Remington as his property. An agreement of this character and a division of the assets of this estate in this manner was valid inasmuch as there were no creditors of the estate. Douglas v. Albrecht, 130 Iowa 132, 106 N. W. 354.

The record shows that there are no persons or interests for whose benefit the intervenor now has a right to administer the property inasmuch as the two heirs of Cora Remington had divided the bonds in question. Heinz v. Vawter, 221 Iowa 714, 266 N. W. 486. The trial court dismissed the petition of intervention and we hold that this action was proper.

The facts involved in connection with the plaintiff's appeal necessitates a more detailed review of the record. The trial court found that there was an inter vivos gift of the twenty-one bonds to the defendant, Nellie Watson. Inasmuch as the former opinion is withdrawn it seems necessary for us to review the evidence. The record is voluminous and it is impossible to summarize all the facts. That portion of the testimony that pertains to the claimed gift of the bonds will be commented upon, but limitation of space will not permit reference to all the evidence presented.

At the time of the trial in the lower court the defendant was 53 years of age. For a number of years she had lived in and about Murray. About the year 1915 she and her husband established their residence in a house adjacent to where Milo Remington and his two sisters lived. The relations between the Watsons, and particularly Nellie Watson, and the two Remington sisters and Milo Remington were very friendly. The evidence discloses that the defendant aided the two Remington sisters in many ways by assisting them in their household activities. Cora and Etta Remington had made known to her their

wishes and plans for their respective funerals in event of their deaths and at the time of the deaths of the two sisters, Nellie Watson took charge of the funeral arrangements and carried out their previously expressed wishes.

Nellie Watson and her husband, Dell Watson, operated a restaurant in Murray, Iowa and at the time of the trial had conducted this business for about eight years. Milo Remington visited the Watsons at their place of business quite frequently and on numerous occasions stayed and visited for a considerable length of time. The Watsons furnished him with many meals and lunches for which they made no charge. The Remington sisters frequently gave gifts to the Watsons and often sent produce from their garden to the restaurant or to the home. At times when gifts and garden produce were given to them the Remingtons would place money in the bottom of the basket. On one occasion Milo Remington purchased an automobile and gave it to Nellie Watson. The evidence does not disclose any intimation but what all these acts were prompted by an appreciation of the kindnesses and services rendered by the Watsons, and particularly Nellie Watson.

Following the death of Milo Remington on January 5, 1937, E. K. Jones, an attorney in Osceola, Iowa had occasion to talk with Nellie Watson. His testimony is in substance as follows: That on January 8, 1937 he visited with Nellie Watson in the restaurant in Murray, Iowa; that she told him, Milo Remington was about the best friend she had; that she had transacted his business for him during the last few years and especially after Cora died; that she had a key to his lock box in the Creston bank and had had for a considerable time; that she went to that box alone whenever she saw fit to do so and that he had signed some instrument giving her authority to go into this box whenever she wanted to or when the occasion called for it. Jones further testified that he told Nellie Watson that he had about $25,000 in notes and mortgages belonging to Milo, Etta, and Cora Remington in his possession and that she told him she knew he had this property. Jones was the attorney and Milo Remington had been the executor of the Cora Remington estate. The evidence further shows that at the time

Jones went to Murray, Milo Remington had passed away and it was prior to Etta Remington's death. The testimony of Jones was to the effect that he had gone to Murray and to the Remington home to have Etta Remington sign an application to appoint somebody as succeeding administrator who might proceed in connection with the Cora Remington estate. At the time of this conversation, according to Jones, Nellie Watson asked him if he had drawn a will for Milo Remington and Jones replied that he had not but that he understood from Orlo (a relative) that Remington had a will. Her reply to this statement, according to Jones' testimony, was: "Yes, he has an old will, but I thought that if he had drawn a will in the last two years, then he would have remembered me."

At the Remington home, he learned Etta Remington was so sick that she could not be seen. As stated previously she died on January 10, 1937. On February 3, 1937 Jones again went to Murray and at that time he and C. E. Bosserman, present administrator with will annexed of Milo Remington's estate, talked with Mrs. Watson. Jones testified that he told Mrs. Watson that they (Bosserman and Jones) had been in Creston the day before to get the contents of Milo Remington's lock box and inquired if she knew whether he had any other lock box. He said she replied that she did not know anything about it. Jones then told her that they did not find the bonds in the box they expected to find and wondered if she knew where they could be. She replied, according to Jones' testimony, that she did not know anything about any bonds. She claimed that she had never seen them. On being shown a receipt for coupons left with the First National Bank of Creston, Iowa by Nellie Watson, prior to Milo Remington's death, to wit, December 19, 1935, her comment was, "Oh, yes, sure. I remember about those bonds." According to Jones' testimony she said she clipped the coupons on the bonds at Creston and deposited the money to Milo Remington's account. Jones, according to his testimony, again asked her if she knew where the bonds were and she said she did not know where they were and Jones further testified: "I told her it would be the duty of the administrator and myself to keep looking for them until we could find them

and told her we had the numbers of each bond Milo had and would be able to identify them whenever we found them.'' Later Jones asked her: ''Have you got those bonds?'' and she replied, ''I am not going to tell you till I talk to Dell.'' Dell, her husband, came into the cafe within a short time and he and Nellie Watson had a short conversation which Jones did not hear. They then came over to where Jones and C. E. Bosserman were sitting and Dell said, in substance, it was not anybody's business what Milo gave away. Jones further testified that ''I told him it was our business, of course, to find out if they had these bonds and if there wasn't anything wrong about it, there wasn't any reason they shouldn't tell us because we had to get some explanation why these bonds were not in the box.'' Nellie then said, according to Jones' testimony, that she could not see where it was any of their business and Jones then, according to his testimony, asked her, ''What about it?'' She then turned to her husband and said, ''Dell, what will I tell them?'' and his reply was, ''Why tell them.'' Then she started to relate to them how she came into possession of the bonds.

On redirect examination, Jones testified that in the conversation of February 3d, Nellie Watson said that she had $21,000 in bonds and said she got them late in the evening of December 14, 1936. She said Milo came into the restaurant the night of the 14th after No. 2, a Burlington passenger train arriving from the west, had gotten in and that he had dinner and that at about the time he got ready to leave he took these bonds out of his pocket and told her he wanted her to keep them. Jones further testified that she said he was in the habit of leaving money, checks, notes and valuable papers with her because he did not like to have them at the farm. She further told Jones that Milo said he wanted her to keep the bonds for him and told her when he left them that if anything happened to him he wanted her to have the bonds. She further told Jones that he (Milo) said it was not anybody's business how she got them. She said she never told a soul about it except Dell. Jones further testified that he asked her if there was anybody present that saw him hand these bonds to her and she

said there was not. He further stated that he was sure she said the date these bonds were handed to her was December 14th.

A witness called on behalf of the defendant, Nellie Watson, was her husband, Dell Watson. He testified that Milo Remington went to Creston December 18, 1936 and that he came into the restaurant that morning and asked where Nellie was and was informed that she had not come down as yet and that he then said he was going to Creston on the train. Dell further testified that he next saw Milo Remington around nine o'clock that night; that No. 2, the passenger train from the west that came in about 8:30, was a little late; that it was about 9:00 o'clock when Milo Remington came in. One of the men who was in the restaurant at that time was a trucker named John McNeal. Dell Watson further testified that when Milo came in he said, "Where's Nellie," and I said "she is in the kitchen." He further stated that he took no part in the conversation "from then on." About that time, according to Dell Watson's testimony, Nellie came out of the kitchen and he (Remington) reached in his pocket and handed her a package and said, "Nellie here's your bonds." Remington is then quoted as saying, "We better go in the kitchen, somebody might come in." Dell Watson further testified that when he went to the kitchen Nellie and Milo were sitting at the table and had the bonds spread out on the table and were looking at them. Nell said, "Look what Milo gave me, aren't they nice." Dell stated he replied, "They sure are." He further stated that Milo and Nellie sat in the back of the restaurant there and talked, until 10:30 or 11 o'clock. According to Dell's testimony he took no part in the conversation but took care of the restaurant and as he passed back and forth he heard them talking about the bonds. He further testified that he overheard Milo say, "Now Nellie these are your bonds, and I don't care what you do with them but I would take them somewhere and put them in safe keeping." According to Dell Watson's testimony he heard Remington say they were the same as money—coupon bonds. There was $21,000 worth of them. He further testified that John McNeal was there during all the time Milo was there. Dell Watson also testified that Milo came to the restaurant the

next morning about half past nine and came out into the kitchen where he was shaving. Helen Burd was present. She had worked continuously for the Watsons for about eight years. Milo walked up to the table where Helen Burd was working and according to Dell's testimony said, ''Well Helen, I went to Creston yesterday.'' Helen replied, ''I know you did. Nellie just showed me the nice present you gave her last night.'' Milo then, according to Dell's testimony, replied, ''I aimed to give these bonds to Nellie sometime ago and got them and fetched them down to her.''

Helen Burd, previously referred to, in her direct testimony related the conversation that she had with Milo Remington much in the same form as was related by Dell Watson in his testimony. She further testified that she was not in the restaurant on the night of December 18, 1936; that she came to work about six o'clock on the morning of December 19th and that she was back in the kitchen working when Milo came in and then she had the conversation that has been previously mentioned. She also testified that she was called upstairs by Nellie Watson between eight and nine o'clock and the bonds were laid on the bed and showed to her. Her further testimony relative to this situation is as follows: ''There was twenty-one, twelve Aurelia, eight Johnson, and one Taylor County. She laid them all out in a row on the bed and told me Milo brought them to her that night when he came from Creston.''

John McNeal, the operator of a truck, testified for the defendant. It was shown that he had known Dell Watson thirty years, Nellie Watson thirty-five years, and had known Milo Remington about twenty years; that he ate at the Watson Cafe ''about all the time, and what few minutes I have I spend in there.'' Concerning the night of December 18, 1936, he testified as follows:

''I came to the restaurant about eight o'clock—8:30— somewhere right in there. I had been north; I took a load of stock to Des Moines and went on to Polk City and got a load of grain, oats. I hadn't had my supper. When I sat down to be served I sat about mid-ways of the counter on the south side.

I'd imagine around fifteen feet from the door that went into the kitchen. When I was in there Milo Remington came in around 8:30 or 9:00 o'clock. I saw Milo pick a brown package out of his pocket and hand it to her [Nellie] and say, 'Here Nellie is the bonds I gave you.' '' Remington, according to McNeal, then said, ''We'll go back in the kitchen. There might someone come in while we're out here.'' McNeal further testified: ''I was around ten feet away when Milo said to Nellie 'Nellie here's the bonds I gave to you.' I saw Milo take the string off the package and they counted out some papers and it was yellow and brown. They said something about the bonds and he was giving them to her and she could do as she pleased with them. I heard him [Remington] say, 'The coupons—I would like to have them as long as I live.' Remington stayed until around ten o'clock that night and Dell took him home in the car. When Remington left, Nellie brought the bonds out and showed them to me. I never counted them. There was a small package of them, I suppose about an inch thick, about ten inches long and about four inches wide. I would judge at the time there was about 18—20 there. He [Milo] visited up there in front that night and talked—about the bond matter. He said he gave Nellie them bonds. * * *.''

On cross-examination McNeal testified that he took a load of oats back to Murray, December 18, 1936; that he got back to Murray about eight o'clock and put the jacks under his truck and then went to the restaurant for supper. He further stated that he took some hogs, a cow, and a calf to Des Moines that day to the Iowa Packing Company, hauling them for Orval Burchett and Farr Brothers; that he got a load of oats from the Polk City Grain Company in Polk City, consigned to him and unloaded at Homer Reasoners. He further stated that he was in the restaurant twenty to thirty minutes that night before Milo Remington came in.

In connection with McNeal's testimony, and as a part of plaintiff's rebuttal testimony, William J. Neeley, office manager, and auditor for the Iowa Packing Company, testified that he had searched the records for the date of December 18, 1936, ''to determine whether the Iowa Packing Company purchased any

livestock from Farr Bros., or John McNeal or Orval Burchett.''
He further testified that these parties ''did not sell any stock to
the Iowa Packing Company December 18, 1936. I searched for a
date near that time when there was a transaction of that char-
acter. I have records here covering two transactions I found.''
This witness then testified that the records of the Iowa Packing
Company showed a check to Orval Burchett, dated December 16,
1936, in the sum of $2.85. He further testified to the effect that
their records showed the issuance of a check issued December
16, 1936, in the amount of $24.14 to the order of Orval Burchett
for one cow. The first check was for one calf. ''These are the
only records of any transaction that I find on or about December
18th and I didn't see any purchase from John McNeal, Murray,
Iowa, at that time. A check for $24.14 bears date December 16th
and the scales ticket for the cow bears the same date; and the
final clearance after inspection is indicated by the stamp 'Paid—
December 19.' ''

One, V. V. Swim, was also called as a rebuttal witness by
the plaintiffs and testified that he lived in Polk City and was
manager of the Polk City Grain Company in 1936. He testified
that there were two places in Polk City where grain business was
transacted; that the other one was the W. O. Sloan Lumber &
Grain Company; he further stated that he was in charge of the
records and bookkeeping at his place of business and made all
permanent records. ''I investigated my records to see whether
on December 18, 1936, John McNeal of Murray, Iowa, bought a
load of oats from us. He did not. I know John McNeal and had
some business with him at other times.'' He further identified an
exhibit consisting of a number of tickets put together with a clip
and stated that they comprised the tickets for the date of Decem-
ber 18, 1936, and showed the grain transactions of the Polk City
Grain Company on that date and stated, ''There wouldn't have
been a load of oats sold to John McNeal December 18, 1936, with-
out my knowing it.''

On cross-examination this witness testified that John McNeal
had several transactions with this company during the month
of December, 1936; that he had purchased corn on December 4,
1936, December 12, 1936, December 16, 1936, December 17, 1936,

and December 23, 1936, and that these were all the transactions for December 1936 with McNeal.

Robert Sloan testified that he was connected with the W. O. Sloan Lumber Company and that his company had an office in Des Moines and in 1936 had a grain business in Polk City. He testified that their records are kept in a duplicate system of journal sheets and ledgers and sales tickets; that a good many of the records, particularly sales and scale tickets, had been discarded. He further identified an exhibit as a sheet of the journal pertaining to the Polk City business which shows the name of the customer, of the sale, and the price and kind of grain sold. The exhibit showed four sales December 18, 1936. There was only one entry of a sale of oats on that date and there was a return item of $5.90 for about thirteen bushel. The other sales on that day were for corn. John McNeal's name did not appear on the exhibit on the day of December 18, 1936.

Further testimony relative to the date of December 18, 1936, is given by one Tom B. Hindes, who testified that on that date he endeavored to pay Milo Remington for some rent but Remington indicated that he did not want to be bothered with receiving it as he said he wanted to take the train to Creston.

Carl Lichre, testifying for the defendant, stated that he remembered seeing Milo Remington in Creston before the holidays in 1936; that at that time Remington said he had been down to the First National Bank; that he was there after some bonds.

G. R. Heflin, cashier of the First National Bank at Creston, Iowa, testified that he waited on Milo Remington in the bank on December 18, 1936 and identified a deposit ticket as an exhibit which showed that Remington had deposited some coupons from Aurelia Iowa School District bonds.

R. I. Pinkerton, Vice President of the First National Bank in Creston, further testified as to the records of the bank, that a deposit was made by Remington on December 18, 1936 and the records show that there was a deposit of interest coupons from twelve Aurelia Iowa School District bonds.

We have heretofore set out somewhat in detail the testimony of witnesses who had any particular knowledge of the bond transaction, or of anything bearing thereon. No consideration has

been given to the testimony of Nellie Watson, who is disqualified as a witness under the "dead man statute", or to the testimony of Orval Sanders who testified on behalf of Nellie Watson and who, as an heir of the Remington estate, is also disqualified. The record is voluminous and it is impossible to set out all the testimony or to comment on it. However, due consideration has been given by the court to all the evidence and exhibits that have been presented and that are admissible, after consideration of the objections made.

This is an action in equity. It is triable de novo before this court and it is incumbent upon this tribunal to make a decision upon the record as submitted. There are many elements which necessitate consideration in reaching our decision. The burden of proof was upon Nellie Watson, the defendant, to prove that Milo Remington during his lifetime gave the bonds in question to her and it is incumbent on her to sustain this burden by clear, convincing, and satisfactory evidence. The defendant, Nellie Watson, by her pleading and presentation of evidence, has assumed this burden of proof and by testimony and exhibits introduced has sought to sustain her contention that there was an inter vivos gift. Has the defendant sustained her burden of proof? And was this a valid gift inter vivos, completed in its details, during the lifetime of Milo Remington?

The testimony of D. K. Jones, the attorney, as previously related, was to the effect that Nellie Watson stated that Milo wanted her to keep the bonds for him during his lifetime and told her when he left them that if anything happened to him he wanted her to have the bonds. This statement is uncontradicted by any competent evidence and under this state of the record, can it be said that there was a completed and consummated gift. It is true that Helen Burd, an employee of the restaurant, testified as to her conversation with Milo Remington. She related the details of his conversation and her observations with a recorded accuracy. After a period of approximately a year and a half, this witness is able to remember and enumerate the particular number of various issues of bonds then claimed to be in the possession of Nellie Watson. This fact may be called to mind by referring to her testimony previously set out. The only other persons, other than Helen Burd, who testified as to the transaction are the

husband, Dell Watson, who qualifies himself by stating that he did not engage in the conversation, and John McNeal, whose testimony, if it has not been impeached, has been materially weakened by the fact that it is undeniably shown that some statements that he made as to his actions and activities on December 18, 1936 are not true. As to his testimony we are of the opinion that a court in the trial of an equity case is subject to the same rules that guide a jury. A court is not bound to disregard the evidence of an impeached witness but it should compare it with other evidence and all the facts proved in the case and then give to it such consideration as it is entitled to under all the facts and circumstances shown. Wimer v. Smith, 22 Or. 469, 30 P. 416; State v. Isley, 62 Or. 241, 124 P. 636.

The statement made by this court in Millowners Mutual Life Insurance Company v. Goff, 210 Iowa 1188, 1194, 232 N. W. 504, 506, is applicable to the present case:

"In determining the truth as to any matter at issue, the trier of the fact should take into consideration, not only what the witnesses say upon the witness stand, but also all of the facts and circumstances as disclosed by the evidence, and the fair inferences to be drawn therefrom. What the interested party did or did not do in the premises, in the light of the surrounding circumstances, is a matter of much consequence in determining the truth."

 Dell Watson, by his own testimony, qualifies himself as a witness. This character of testimony is commented upon in the case of Peck v. Foggy, 199 Iowa 922, 924, 202 N. W. 754, 755, where this court in commenting upon testimony of this nature and witnesses of this character says relative to the "dead man statute", Code 1939, section 11257:

"* * *. The ban of this statute is avoidable, in legal effect, as to conversations in which the witness took no part. The avoidance of this ban seems to have been reduced to a formula, which has become quite standardized, and which has become very familiar to the courts. It will be noted, therefore, that the evidence relied on by the plaintiff is of such nature that it cannot be contradicted by direct evidence. If met at all, it must be by the

attendant circumstances and by legitimate inferences to be drawn therefrom.

"In such a case, the court is under special duty to scan and to scrutinize closely, and to put such evidence to every test of credibility available to it, in the record. In order to award title to the plaintiff, the court must be able to say that the evidence is not simply sufficient to make a prima-facie case, but that it is sufficient, in the light of all the circumstances, to carry conviction to the mind of the court, of its essential credibility. Its credibility is not necessarily established by mere positiveness of the witness, nor by perfection of the legal form in which the words of the alleged conversation are reported."

Taking into consideration the right that the court has to give to the questioned testimony of John McNeal, the very apparent interest of Dell Watson, and the exacting description of the whole transaction as related by Helen Burd, it appears to this court that there is much to question the claim of the defendant, Nellie Watson. As was stated in Peck v. Foggy, supra, (925) the statement there noted relative to the "dead man statute" Code 1939, section 11257, seems quite applicable to the evidence generally in this case.

"Paradoxical as it may seem, the more nearly perfect the evidence in a legal sense, the less may be its credibility. That is to say, the more important the evidence, the greater the challenge to its credibility. It is sometimes observable, in this class of cases, that the occasional witness, by the very perfection of the form of his evidence, discloses his conscious knowledge of the legal necessities of the case. In appraising the value and weight of such evidence, only indirect tests are available. These may be, and often are, effective either to confirm or to destroy the evidence of words. In putting the evidence to such tests, the first quest of the judicial mind is for anchorage,—something in the record which can be 'tied to' as a *verity*; some fact which is indisputable, or which has been well proved in the record."

In Peterson v. Citizens State Bank, 228 Iowa 219, 223, 290 N. W. 546, 548, Stiger, J., speaking for this court, states:

"In Holmes v. Connable, 111 Iowa 298, 82 N. W. 780, 781,

the rule applicable under such circumstances is stated in the following language on page 301: 'The lips of the only two witnesses who could deny it [the contract] are forever closed. The only person who could controvert the admissions alleged to have been made is the dead man against whose estate this claim is produced. There is no defense that can be made, save as it may be found in the improbability of the stories of the plaintiff's witnesses, when tested by comparison with other evidence in the case, or the ordinary rules of human conduct under similar circumstances. * * * "It is incumbent on the court to look upon such evidence with great jealousy, and to weigh it in the most scrupulous manner, to see what is the character and position of the witnesses generally, and whether they are corroborated to such an extent as to secure confidence that they are telling the truth." ' [Citing cases.]"

It is essential that in a case such as is before this court that there be proof of a donor's intention and purpose to give and of a donor's intention to pass title by the gift and that there has been delivery, in pursuance of that purpose and intent. The burden of proof as to all these essential elements is on the one who makes claim to the gift and it is incumbent upon the donee to show that the evidence of the consummated gift is clear and satisfactory. Runnels v. Anderson, 186 Iowa 1370, 1380, 173 N. W. 91, 94.

In the case of Wilson v. Wilson, 99 Iowa 688, 692, 68 N. W. 910, 911, it is said concerning gifts of this nature:

"The law is well settled (and is not questioned in this case), that the burden is upon the plaintiff to establish the alleged gift; that 'the evidence of the gift must be direct, positive, express, and unambiguous,' and must show that the gift has been completely executed. 'It is, therefore, necessary to the validity of a gift, that the transaction be fully completed; that nothing essential remains undone.' 8 Am. & Eng. Enc. Law, 1313. *Shellhammer v. Ashbaugh,* 83 Pa. St. 24. * * *."

Admitting, for the purpose of argument, the competency of certain evidence, it must be kept in mind that at least two of the witnesses testified that the bonds were given to the defendant

subject to the condition that the donor, Milo Remington, should have the income or coupons therefrom during his lifetime. It cannot therefore be said that the gift was a consummated and completed one.

There are many other elements of testimony which merit our consideration, and if space would permit, our comment. There has been intimation as to the possibility that perhaps the bonds were taken out of the lock box by Nellie Watson. We do not feel that it is necessary for us to reach our decision upon this theory. We are satisfied that we can and are able to decide this case upon the theory that the defendant has not sustained her burden of proof to substantiate the claimed gift. This court in Malcor v. Johnson, 223 Iowa 644, 651, 273 N. W. 145, 149, in quoting from 28 C. J. 676, section 82, said:

" '* * *, it is held that gifts inter vivos are watched with caution by the courts, and that to sustain them the evidence must be clear and convincing, * * *.' "

In section 82, 28 C. J. 678, we also find this statement, which is applicable in the present case:

"* * *. In weighing conflicting evidence it is not sufficient, however, that the preponderance of evidence may turn the scale slightly in favor of a gift. The preponderance must be such as to leave no reasonable room for doubt as to the donor's intentions."

It is our considered judgment that upon the evidence presented the defendant has not met the burden of proof to show that the gift was a completed and consummated one and that said gift has not been proven by such convincing and satisfying evidence as required in order to sustain gifts of this character.

We therefore hold that the trial court was in error in its findings in favor of the defendant and consequently conclude that said court should be reversed. This cause is therefore remanded to the trial court with instructions to enter a decree in conformity with our holdings herein announced.—Affirmed on intervenor's appeal, reversed on plaintiff's appeal.

HALE, C. J., and MILLER, SAGER, and BLISS, JJ., concur.