LEWIS FREESEMAN, Appellee,. v. FRED HENRICHS, Administrator, Appellant.

No. 46144

NOVEMBER 17, 1942.

REHEARING DENIED MARCH 19, 1943.

F. J. McGreevy, of Ackley, for appellant.

Harvey Uhlenhopp, of Hampton, for appellee.

MITCHELL, J.—Lewis Freeseman commenced this action in equity seeking to impress a trust on two thirds of the residuary personal property of the estate of his deceased brother, Dick Freeseman. It is brought by Lewis Freeseman against Fred Henrichs, as administrator of the estate of Tillie Henrichs, deceased, sister of said Dick and Lewis Freeseman, Tillie Henrichs having died prior to the time this action was commenced. The basis of the action is an alleged oral conversation had between Dick Freeseman and Tillie Henrichs in which it was agreed that Dick Freeseman would will Tillie Henrichs two thirds of his residuary personal property and she would give one half thereof to her brother Lewis Freeseman.

The defendant filed a general denial and a claim of settlement. There was a trial to the court, which entered a decree and judgment as prayed by the plaintiff, and the defendant, the administrator of the estate of Tillie Henrichs, has appealed.

This case is triable de novo in this court. On many occasions we have said that, in order to enforce an oral contract such as is claimed here, more than a bare preponderance of the evidence is required. The evidence must be clear, convincing, and satisfactory. Wagner v. Wagner, 208 Iowa 1004, 224 N. W. 583; Peck v. Foggy, 199 Iowa 922, 202 N. W. 754; Hart v. Hart, 181 Iowa 527, 164 N. W. 849; Bosserman v. Watson, 230 Iowa 627, 298 N. W. 804.

With the above rule of law in mind, we turn to the record to examine the evidence. Dick Freeseman, an unmarried man, died November 7, 1940. He left surviving him two

brothers and two sisters. He had property inventoried in his estate at about $36,000. One sister, Mrs. Sapp, living at Buffalo Center, owed him $9,000; the other sister, Mrs. Henrichs, appellant's intestate, owed him about $4,500. She lived south of Allison. One brother lived at Parkersburg, and the appellee, his other brother, lived across the street from decedent in Allison. Tillie Henrichs died September 26, 1941, intestate, and Fred Henrichs was appointed administrator of her estate and is the appellant in this cause. This action was begun on April 16, 1942. The appellee offered as witnesses in support of his main contention as to the oral conversation under which he makes this claim, three witnesses—the appellee, his wife, and one Eno Endelman, who works as a carpenter in the town of Allison, Iowa. Lewis Freeseman testified that about the first of March 1940, his sister Tillie Henrichs, her husband and her son, came over to see her brother Dick Freeseman one evening; that on that evening the brother Dick Freeseman was over at Lewis' house, and Mr. Henrichs and John Henrichs went downtown but his sister Tillie Henrichs came over to Lewis' house; that they talked about various things, and finally Tillie asked her brother Dick if he was going to make a will and said that she would not be able to pay back the $4,500, which she owed him. Dick Freeseman replied that he intended to make a will and it would not be necessary to pay the money back; that he was going to cancel the debt which his sister Mrs. Sapp owed him; that he was going to give to Meelf the Dakota land, and the rest of the money "what is going to be left after everything is settled I want that equally divided between Meelf my brother at Parkersburg and my sister Mrs. Fred Henrichs and between Lewis and I put that in your hands until everything is settled and you turn it over to him and he said you don't need to do it for nothing, he said I will see to it that gets in the will five hundred dollars she should have for that. She said no, I don't want it, he always has had bad luck he said, you don't need to do it for nothing, I got plenty of money, you get five hundred dollars for that. All right she said and Dick all right."

Appellee testified that his wife was present and that he and his wife took no part in the conversation. He testified that there

was another talk between his sister Tillie Henrichs and his brother Dick Freeseman, which also took place over at his house, and that the only parties present were Tillie Henrichs, Dick Freeseman, the wife of the appellee, and himself. The conversation at that time, as he relates it, was practically the same as on the first occasion. The testimony of the wife of the appellee, Mrs. Lewis Freeseman, is practically the same as that of her husband. The only other testimony in regard to `the oral conversation relied upon was that of Eno Endelman, a carpenter, who lives in Allison and who was a tenant in a house owned by the appellee, Lewis Freeseman. Endelman testified that he went to see Dick Freeseman about renting a lot for a garden; that Lewis Freeseman and Tillie Henrichs were talking; that he heard a talk between Tillie Henrichs and her brother Dick Freeseman in which he heard Dick Freeseman say to Tillie Henrichs:

"Lewis was going to get the house to live in as long as he lived and the other boys, I know them, they was going to get their share, then there was some money left and Dick says and they was going to divide up the money but Lewis won't get any in his name in the will and he was going to give it to Mrs. Henrichs and she was going to get five hundred dollars for it and Tillie says I don't want five hundred dollars for it and she says, Dick told her you got it coming you are going to get it * * *."

While the witness was positive as to the conversation he could not definitely fix the date as to when it took place.

The appellee also offered evidence to show that he was friendly with his brother Dick Freeseman and that his wife nursed him and cared for him and that he managed the funeral arrangements.

The appellant offered the testimony of Carroll Wild, a lawyer at Allison and county attorney of Butler county. He testified that Lewis Freeseman, the appellee, came to his office about the fifth of March 1940, and asked him to go down and see his brother Dick Freeseman, and that in compliance with the request he did go to Dick Freeseman's house. The appellee

Lewis Freeseman was present on that day and took part in the various conversations that he had regarding the making of Dick's will. Wild testified as follows:

"A. Well, first Dick said that he wanted to give his North Dakota land to his brother Meelf and then he stated that in order to equalize that devise he wanted to give a money bequest to his sister, Mrs. Henrichs, and as I recall we had rather a lengthy discussion on the value of the North Dakota land. Dick felt the land was quite valuable and he finally determined he would give Mrs. Henrichs a bequest of five hundred dollars to more or less equalize the devise of land to his brother Meelf and we then discussed the matter of disposing of a few items of personal property such as some dishes I believe and then there was some talk of giving something to Lewis and Dick wanted to be certain that Lewis would be able to keep it, he intimated Lewis had some difficulties in years past, financial difficulties and he wanted to give him the home and be certain it didn't get away from him and at that time I suggested it be placed in a trust. Lewis entered into the conversation as well and that arrangement appealed to him and I believe it was Lewis that suggested that the property be divided among the children after his death. All during this conversation I was making notes to, on a rough sheet of paper, to take back to the office to prepare the Will itself. There was some further talk of family matters. Dick stated when we came down to prepare the residuary clause— * * *.

"A. Maybe I misunderstood the question but I understood I was asked what took place at that time. We came down to the matter of discussing the disposition of the residuary estate and Dick I believe stated that Mrs. Henrichs had always been very close to him during his lifetime, had always done his washings for him and I believe had been in Dick's home during his lifetime more than any of the rest of the family and he expressed a desire that she should have more than, he would like to benefit her more than the others and it was then suggested she be given more of the residuary estate than Meelf. Perhaps I am getting ahead of my story. Prior to that time there was also discussed the matter of disposing of some of the obligations

that the family owed him, owed Dick. Dick stated he wanted Fred Henrichs to have his note, Fred owed Dick some money I think about $4,400 and Dick wanted to give that to Fred. I suggested Dick give it to his wife for the purpose of cutting the inheritance tax in two. He also wanted to give Mr. and Mrs. Sapp the note they had jointly signed and in that same case I suggested that the note be given to Mrs. Sapp, his sister, for the purpose of saving inheritance tax. Meelf also owed Dick some money and Dick didn't seem to want to give Meelf the notes so Meelf's note wasn't bequeathed to him. Then as I said, we, I believe after that we got to discussing that matter of the residuary estate and as I have testified Dick had stated that he wanted Mrs. Henrichs to be well taken care of during her life and he finally determined he would give her two-thirds of it and his brother Meelf one-third.''

On the following day Wild went down to see Dick Freeseman, he having prepared a draft of the will in longhand. On that occasion no one was present. He testified that Dick told him that he wanted the matter of the trust for Lewis on account of the fact that Lewis had had hard luck and his money had got away from him and he wanted to give it to him so it would not get away from him. On the following day, March 7th, Wild went back with the will prepared. There were present besides Dick Freeseman, Mr. and Mrs. Francis Allen, neighbors whom he desired to witness the will, Lewis Freeseman, the appellee, and Wild. The will was signed at that time, Lewis Freeseman assisting in signing as Dick was afflicted with a palsied condition.

In August 1940, Lewis Freeseman again told Wild that his brother Dick wanted to change his will so that Lewis would get his Chevrolet automobile, and on August 1, 1940, a codicil to the will of Dick Freeseman was prepared and executed, the same witnesses signing who had witnessed the will. In the codicil he bequeathed to his brother-in-law Fred Henrichs certain lumber and materials located on his residence property in Allison, Iowa, and his fur coat; to his nephew John Henrichs, a son of Tillie Henrichs, he gave his gold watch and all of the garden implements and tools; and to his brother Lewis Freeseman, the appellee in this case, he gave his bed, bedding, fur robe, and his

Chevrolet automobile. Wild testified that he received a letter from Alice Freeseman, wife of Lewis Freeseman, in which she stated she had a claim against the Dick Freeseman estate for cooking, in the amount of $160. Apparently this letter was not introduced in evidence. On the 25th day of September 1941, Mrs. Lewis Freeseman filed in the estate of Dick Freeseman a claim in the amount of $1,000 for services which she alleged she rendered to the said Dick Freeseman in the ten months preceding the time of his death, which occurred in November 1940; that she performed services for him, taking care of him, feeding him, nursing him, and otherwise attending him during his last sickness. The claim is filed in three counts, the first count alleging that she is entitled to that amount for services rendered and that the decedent had accepted them and expected to pay for them. In counts 2 and 3 she makes the same allegations as to the services rendered but alleges that there was an oral agreement between the claimant and the decedent that she should be paid the sum of $1,000. It will be noted that Dick Freeseman died on November 7, 1940, and this claim was not filed until September 25, 1941, or a matter of better than ten months after the death of Dick Freeseman. There is evidence in regard to negotiations concerning the settlement of the claim of Mrs. Lewis Freeseman against the Dick Freeseman estate. During these settlement talks Lewis Freeseman, the appellee in this case, made statements and threats that he was going to contest the will of Dick Freeseman. Finally a compromise was entered into and a written release and satisfaction prepared. It is dated the nineteenth of March 1942. It was signed not only by Mrs. Lewis Freeseman but by Lewis Freeseman himself and by a witness, and it contains this provision:

"And, in consideration of the payment as aforesaid to Mrs. Louie Freeseman, his wife, the said Lewis Freeseman does hereby release any and all claims he may have against said estate and any and all causes of action which he may have for the setting aside of the will of the said Dick Freeseman, deceased, and in consideration of the payment aforesaid the said Lewis Freeseman does hereby covenant and agree with all of the devisees under the will of the said Dick Freeseman, deceased,

that he will not institute any action for the setting aside of said will at any time.".

There is some dispute in the evidence as to whether or not at the time this release and satisfaction was entered into Lewis Freeseman, the appellee, had made a claim that he was entitled to half of the money which Tillie Henrichs was to receive from the Dick Freeseman estate. Mr. Wild, the attorney, testified positively that he had no knowledge of any such claim and that he would not have made the settlement if he had had, while Lewis Freeseman testified that he told Wild and they talked about an adjustment of the claim involved in the case at bar on a fifty per cent basis.

In the very recent case of Bosserman v. Watson, 230 Iowa 627, 640, 298 N. W. 804, 811, this court, quoted from the case of Peck v. Foggy, 199 Iowa 922, 924, 202 N. W. 754, 755, as follows:

" 'The ban of this statute is avoidable, in legal effect, as to conversations in which the witness took no part. The avoidance of this ban seems to have been reduced to a formula, which. has become quite standardized, and which has become very familiar to the courts. It will be noted, therefore, that the evidence relied on by the plaintiff is of such nature that it cannot be contradicted by direct evidence. If met at all, it must be by the attendant circumstances and by legitimate inferences to be drawn therefrom.

" 'In such a case, the court is under special duty to scan and to scrutinize closely, and to put such evidence to every test of credibility available to it, in the record. In order to award title to the plaintiff, the court must be able to say that the evidence is not simply sufficient to make a prima-facie case, but that it is sufficient, in the light of all the circumstances, to carry conviction to the mind of the court, of its essential credibility. Its credibility is not necessarily established by mere positiveness of the witness, nor by perfection of the legal form in which the words of the alleged conversation are reported.' "

At page 641 of 230 Iowa, page 811 of 298 N. W., the court, speaking through the present Chief Justice Wennerstrum, said:

"Taking into consideration the· right that the court has to

give to the questioned testimony of John McNeal, the very apparent interest of Dell Watson, and the exacting description of the whole transaction as related by Helen Burd, it appears to this court that there is much to question the claim of the defendant, Nellie Watson. As was stated in Peck v. Foggy, supra, (925) the statement there noted relative to the 'dead man statute' Code 1939, section 11257, seems quite applicable to the evidence generally in this case.

" 'Paradoxical as it may seem, the more nearly perfect the evidence in a legal sense, the less may be its credibility. That is to say, the more important the evidence, the greater the challenge to its credibility. It is sometimes observable, in this class of cases, that the occasional witness, by the very perfection of the form of his evidence, discloses his conscious knowledge of the legal necessities of the case. In appraising the value and weight of such evidence, only indirect tests are available. These may be, and often are, effective either to confirm or to destroy the evidence of words. In putting the evidence to such tests, the first quest of the judicial mind is for anchorage,—something in the record which can be "tied to" as a verity; some fact which is indisputable, or which has been well proved in the record.' "

In Peterson v. Citizens State Bank, 228 Iowa 219, 223, 290 N. W. 546, 548, Stiger, J., speaking for this court, states:

"In Holmes v. Connable, 111 Iowa 298, 82 N. W. 780, 781, the rule applicable under such circumstances is stated in the following language on page 301: 'The lips of the only two witnesses who could deny it [the contract] are forever closed. The only person who could controvert the admissions alleged to have been made is the dead man against whose estate this claim is produced. There is no defense that can be made, save as it may be found in the improbability of the stories of the plaintiff's witnesses, when tested by comparison with other evidence in the case, or the ordinary rules of human conduct under similar circumstances. * * * "It is incumbent on the court to look upon such evidence with great jealousy, and to weigh it in the most scrupulous manner, to see what is the character and position of the witnesses generally, and whether they are corroborated to

such an extent as to secure confidence that they are telling the truth." ' " (Citing cases.)

It is the claim of the appellee that the reason why this secret trust agreement was made, why it was not even exposed to the attorney who drew his will, was on account of the fact that Lewis Freeseman, the appellee, had creditors that would grab his money, and the inability of Lewis Freeseman to take care of money. But we find that at the time this will was prepared—and it must be kept in mind that Lewis Freeseman was there at the time and participated in the conversations—the very question of a spendthrift trust was talked about and the attorney who prepared the will talked with Dick Freeseman, the testator, and in the will there is set up a trust covering a piece of property in the town of Allison, Iowa. So we find that Dick Freeseman in his very will provided for a trust for this appellee. He had been informed in regard to a trust by his attorney. Lewis Freeseman, the appellee, was present. Nothing was said at that time about any oral arrangement between Dick Freeseman and his sister Tillie Henrichs, nor did Dick Freeseman at that time show any intention or desire to leave to his brother Lewis Freeseman the property which Lewis is now claiming. The record also shows that on the first of August 1940, Dick Freeseman prepared a codicil to his will. Again, Lewis Freeseman knew of the codicil and asked the attorney to come down and prepare it. In the codicil Dick Freeseman again left property to Lewis Freeseman, including a Chevrolet automobile, but no mention is made of any additional property that Dick Freeseman desired to leave to his brother Lewis. In addition to this we find this appellee, Lewis Freeseman, making threats and claims that he was going to set aside the will of Dick Freeseman. The setting aside of the will is inconsistent with his claim in this case, because if the will was set aside, then he would have no claim as he now alleges. There is evidence in the record that it was the threat of the will contest that brought about the settlement of the claim of Mrs. Lewis Freeseman, and while the release and satisfaction does not refer to any claim against the estate of Tillie Henrichs, it shows that it was an important consideration in the settlement of the claim of Mrs. Freeseman

against the Dick Freeseman estate. There is also evidence in this record that no claim such as is set forth in this case was ever made by Lewis Freeseman until after the settlement of his wife's claim. In fact, the record shows that that claim would not have been settled had there been any contention on the part of Lewis that he had a claim such as he is now alleging. It is contended by appellee that Bosserman v. Watson, supra, is not controlling because the family relationship did not exist in that case. It is true in the Bosserman v. Watson case there was not a family relationship, but the record in that case and the opinion show that the friendship between the parties was a very close one and existed over a great many years.

The only witnesses offered to prove the oral contract were the appellee, his wife, and a tenant in a house of the appellee. Lewis Freeseman, the appellee, was present at the time the will of his brother Dick Freeseman was prepared. He participated in the various conversations had at that time between his brother and the attorney preparing the will. No mention was made of the claim now alleged. At the time that the will was prepared, the question of a spendthrift trust for Lewis Freeseman was then discussed, and the will sets up one. Lewis Freeseman threatened to contest the will of Dick Freeseman, which was inconsistent with the claim he now alleges. The wife of the appellee filed a claim against the estate for services. In the settlement of that claim Lewis Freeseman signed a written release and settlement. Although his brother Dick Freeseman died on November 7, 1940, this action was not begun until April 16, 1942. We come to the conclusion that the evidence is not as clear, convincing, and satisfactory as this court has held is necessary to establish an oral trust, and it necessarily follows that this case must be, and it is—Reversed.

WENNERSTRUM, C. J., and BLISS, GARFIELD, OLIVER, MILLER, HALE, and SAGER, JJ., concur.