VERA GARMAN, Appellee, v. ROBERT W. WETTENGEL, Administrator, et al., Appellants.

**FRAUDS, STATUTE OF:** Oral Contract for Property in Return for Services. In the proof of an oral contract for all of the property, real and personal, of a party at his decease, in return for services performed, the court is under the special duty to apply to the supporting testimony every fair test which tends to weaken its credibility. Evidence held to establish the contract in question.

Headnote 1:  36 Cyc. p. 784 (Anno.)

*Appeal from Shelby District Court.*—GEORGE W. CULLISON, Judge.

APRIL 8, 1925.

SUIT in equity against the administrator of Tom Miller, deceased, for specific performance of an oral contract, whereby the plaintiff was to receive all the property of the decedent at

the time of his death, in consideration of services to be rendered by plaintiff, and actually rendered by her, during the lifetime of the deceased. The defendants other than the administrator are the two sons of the deceased, resident in the state of Pennsylvania. There was a decree for the plaintiff, and the defendants appealed.—*Affirmed.*

*L. W. Fallon* and *Edward S. White,* for appellants.

*P. W. Harding* and *Shelby Cullison,* for appellee.

EVANS, J.—The real name of the deceased was Tobias Dengler. Throughout his residence in Iowa, however, he had assumed the name of Tom Miller, and he was so known and is so referred to in the testimony; and we shall refer to him herein by such name. This case belongs to a class which usually challenges the scrutiny and the skepticism of the court. The evidence upon which such a case usually rests is such, in its very nature, that direct disproof is quite impossible. The defendants must rely largely upon circumstances of inconsistency and improbability. Such case imposes upon the court the special duty of receiving the direct testimony relied upon by plaintiff, subject to every fair test which tends to weaken its credibility. Such is the rule contended for by appellants here. Needless, perhaps, to say that the substantial equity, or want thereof, which supports the claim of plaintiff is always an influential consideration. This case has some remarkable aspects that have to do more particularly with the life history of the deceased. He came to Iowa in the year 1875, to the town of Denison. It was at that time that he assumed the name of Tom Miller. He purported to be an unmarried man, and throughout his later life purported to be a bachelor. He came from Pennsylvania. His name there was Tobias Dengler. He abandoned there his wife and two children. He was married there in November, 1871. His oldest child, a son, was born in April following; and a second son was born in 1874. In 1893, he visited his mother in Pennsylvania, but did not visit his family. The wife died in 1894. Shortly prior to 1903, he removed from Crawford County to Shelby County, where he had acquired a farm of 80 acres, which farm he thereafter occupied for several years. In his

first occupancy, he lived as a bachelor, without any housekeeper. Shortly thereafter, an unmarried sister came from Pennsylvania, and kept house for him for a period of two or three years. In. the fall of 1903, he wrote to his cousin, Mrs. Ella Garman, recently widowed, and invited her and her daughter to visit him and his sister. This invitation was accepted. Mrs. Garman was then about 50 years of age, and her daughter 26. The daughter is the plaintiff herein. They remained in the Miller home for the period of two years, at the expiration of which time, Miller's sister determined to return to Pennsylvania. At this juncture, it is claimed that Miller entered into an oral agreement with the daughter, plaintiff herein, that she and her mother should make their home with him upon the farm, and that she should become his permanent housekeeper, and that, in consideration thereof, she should have whatever estate he had at the time of his death. This contract is testified to in the first instance by Mrs. Garman. This testimony is corroborated by testimony of a large array of witnesses, apparently disinterested, to whom Miller had communicated his arrangement with the plaintiff. There is considerable evidence fairly tending to show that the plaintiff had reason to believe, and did believe, that Miller had made a will, in conformity to such expectations on her part. He died intestate in October, 1920.

The plaintiff was a graduate of the high school of Harrisburg, Pennsylvania. Preceding her coming to Iowa, she was bookkeeper for a telephone company at a wage of $40 per month. After coming to Iowa, she took a short course in the normal school with a view of becoming a school-teacher. She passed her first examination for that purpose, and obtained a certificate. Though she received only a third-grade certificate, her rating was creditable, being more than 88 per cent on an average. This occurred just preceding the time of the alleged contract. From December, 1905, she devoted her time exclusively to the Miller home, the household consisting of Miller and her mother and herself. Miller's health was not rugged, and his frailties naturally increased with his years. He was under 70 when he died. About 10 years before his death, he disposed of his 80-acre farm, and acquired another, of 120 acres, which latter farm he occupied up to the time of his death. This farm is described as an

inferior farm. Though he occupied it, he did not himself farm
it. Reserving from 10 to 20 acres for hay and pasture, he rented
the remainder to a tenant on shares. He kept such live stock
as he could feed from his rent share, including 8 or 10 cows.
The revenue of the household came almost exclusively from but-
ter and eggs. It is undisputed that the plaintiff took full care
of the cows, and did the milking. She likewise had charge of the
fowls. She was without doubt the mainstay of the household.
She did the work which would ordinarily be expected from a
hired man. She appears to have been better able physically than
was Miller, to do it. No wage was ever paid to her, nor was any
ever agreed on. She received her daily living and her working
clothes from the proceeds of the farm. The better and more ex-
pensive clothing was supplied to her and her mother, by her
brother. The household appears to have been harmonious at
all times. If the contract was made, as alleged, the plaintiff
faithfully performed the same on her part. There is no ques-
tion but that she was instrumental in surrounding Miller with
the comforts of home, and that he was content therewith; and
that she devoted 15 years of the best of her life, in that service.

On one occasion, the brother of the plaintiff sought an inter-
view with the deceased, and asked him definitely what the ar-
rangement was between him and the plaintiff. Miller said to
him that he had made his will, giving his property to the plain-
tiff. So far as appears from other evidence, Miller's statement
in that respect was untrue. Other witnesses had been given to
understand substantially the same thing, by Miller in conversa-
tion with them. It appears on behalf of the defendants that,
about two weeks before the death of Miller, he spoke to the
witness (the defendant administrator) about making a will, and
told him then, in substance, that he would see him later, after
he had made up his mind just how he wanted it made. There is,
therefore, much ground in the evidence for believing that Miller
really intended to make a will, and that there was no particular
reason for his making a will, except for the purpose of protect-
ing the plaintiff in whatever arrangement he had made with her.

To revert further to the history of Miller: he went to Penn-
sylvania in 1912, and there visited his sons for the first time
since his abandonment of them. Again, in 1919 he wrote a

friendly letter to the younger son, wherein he sent his regards to the older one. This evidence would be consistent with a pos· sible desire on his part to have his estate pass to his sons; though no expression to such effect was ever made by him to them or to anyone else, so far as appears. Though Mrs. Garman was a first cousin of Miller's, she never lived in the same part of the state, and was not personally acquainted with him until she came to Iowa, in 1903. He and she were about the same age, and had once met as children, 7 years of age. Mrs. Garman did not know of his marriage, or that he had any family. At the time the alleged arrangement was entered into between plaintiff and Miller, and throughout the years following, Miller was, to all appearances, a bachelor, and subject to all the discomforts of "baching" alone upon his farm, in the absence of some arrangement for a housekeeper.

It is urgently contended by the appellants that the conduct or attitude of the plaintiff following the death of Miller was inconsistent with her present claim. It appears that, shortly after the death of Miller, the two sons and their attorney appeared at the Miller home, and had a conversation with the plaintiff concerning the estate. They pressed upon her the query as to *how much* she was claiming for her services. She declared herself unwilling to discuss the subject with them until she had first seen her brother, who was intending to consult an attorney in her behalf. It is argued that she did not at that time claim to be the owner of the estate. It is argued also that the purport of the conversation was the assumption that the only question between them at that time was the *amount* claimed by her for her services. The conversation testified to shows that this was the assumption on the part of the defendants. The declination on the part of the plaintiff to discuss the matter was not neces- sarily inconsistent with her later attitude.

It appears also that she wrote a letter to Miller's sister, and it is claimed that this letter is inconsistent with her present attitude. The following excerpts from the letter will indicate what is claimed to be inconsistent:

"The people think it awful here that Tom didn't make a will and left us in such a state. What Tom should have done was to deed over this farm to mother and I and then when the

farm was sold if there were any stipulations to be made then they would be carried out and would have saved a whole lot of trouble and expense. The reason I think Tom wants us to stay on the farm another year, of course, you know it is rented to a new man this coming year, was to make this extra money, by that I mean, there are a whole lot of expenses to meet. As I told you he had very little money in the bank, he sold four steers not so long ago, to pay the interest on the loan which is $110, also the last half of the taxes which were forty some dollars. That was due on the first of Oct. and now they will fall due again on the first of April. Now if we had sale now, there are only sixteen head of cattle and three head of horses and the old machinery besides the grain and hay won't pay for all of the expenses. * * * Mother and I were looking over all of Tom's papers, thinking that we might find a scratch somewhere, but all was in vain, oh you can't imagine how bad I must feel, to think he left mother and I thus.''

It is beyond doubt that the plaintiff was greatly disappointed when she learned that Miller had left no will. She appears to have believed for a time that, unless a will could be found, her arrangement would be thwarted. We cannot lose sight of this mental attitude on her part, in passing upon the question of her consistency. Indeed, we are convinced from the record that she believed that Miller had made a will, and that she was fully protected thereby, and that her discovery to the contrary operated as a great discouragement upon her.

Upon a careful and skeptical reading of this record, we have become convinced that the plaintiff's claim is not lacking in substantial merit; that there was an arrangement of some kind between her and Miller that accounted for her devoting 15 years of her life to his comfort. The equities behind the plaintiff's claim are strong enough to warrant their acceptance as corroboration of the direct testimony in the record, in support of such claim.

We reach the conclusion that the plaintiff's case is well proved. The decree of the district court is, accordingly, affirmed.—*Affirmed.*

FAVILLE, C. J., and ARTHUR and ALBERT, JJ., concur.