BRYANT *v.* P. H. WHITING & CO.

SAME *v.* SAME.

1. LICENSES—SECURITIES DEALERS—DELIVERY—TRANSFER—CONVERSION—NOTICE.

Where stock purchased by securities dealer for customer, but not issued in her name, was not delivered to her but remained in dealer's vault °at salesman's suggestion, fact that owner afterward received and cashed salesman's personal checks for dividends, which came in envelopes with dealer's return address thereon, *held,* insufficient to charge her with notice that salesman was using her stock for purposes of his own, or that she had knowingly authorized him to do so.

2. SAME—DUTY TO DELIVER FOR TRANSFER.

Securities dealer, having knowledge that purchase of stock made by its agent was for plaintiff, had duty to see that said stock was delivered to her so that, if not issued in her name, she might take proper steps to have it so transferred.

3. SAME—PURCHASER HAD RIGHT TO BELIEVE STOCK TRANSFERRED.

Purchaser of stock permitting it to remain in dealer's vault at salesman's suggestion, *held*, entitled to believe that it had been transferred to her.

4. SAME—LIABILITY OF DEALER FOR SALESMAN'S FRAUD.

That purchases of stock are made by personal friends of salesman, in whom they have confidence, does not relieve dealer from frauds perpetrated by its salesman, whose integrity it vouches for.

5. SAME—BLUE SKY LAW—PURPOSE OF LICENSE AND BOND.

Purpose of license issued to securities dealer and bond filed by it with securities commission conditioned on faithful compliance with provisions of blue sky law (2 Comp. Laws 1929, § 9790), is to afford protection to any person dealing with salesman.

6. SAME—PRINCIPAL AND AGENT—SALESMAN'S FRAUD CHARGEABLE TO DEALER.

Where purchaser of stock dealt with salesman as agent of dealer, salesman's fraudulent acts in such dealings are chargeable to dealer.

7. SAME—WHEN DEALER LIABLE FOR SALESMAN'S FRAUD.

Where purchaser of stock allowed it to remain in dealer's vault, at salesman's suggestion, and salesman later used it for purposes of his own, dealer is liable for salesman's fraud, in absence of showing that purchaser authorized, or had knowledge of, said use by salesman.

8. SAME—WHEN DEALER NOT LIABLE.

Where evidence clearly shows that purchasers of stock allowed it to remain in salesman's possession for his personal use as collateral to loans from bank, dealer employing salesman is not liable for his conversion of said stock to his own use.

Appeal from Wayne; Lamb (Fred S.), J., presiding. Submitted October 6, 1932. (Docket No. 36, Calendar No. 36,691.) Decided January 25, 1933.

Separate actions of assumpsit by Sarah E. Bryant and Ralph Bryant and another against P. H. Whiting & Company, Inc., a foreign corporation, and George E. Brennan to recover funds intrusted for investment and misappropriated. From judgment for plaintiffs against defendants, defendant company appeals. Affirmed as to plaintiff Sarah E. Bryant; reversed as to plaintiffs Ralph and Mayme Bryant and judgment ordered entered for defendant company.

*Bryant & Hill,* for plaintiffs.

*Lightner, Hanley, Crawford & Dodd* (*Clifford M. Toohy* and *George D. Haller* of counsel), for defendant company.

SHARPE, J.  By consent of counsel these two cases were tried at the same time before the court and without a jury.  A judgment in favor of each of the plaintiffs was rendered against both defendants, from which the defendant Whiting & Company, hereafter called the defendant, has taken this appeal.

The plaintiff Sarah E. Bryant is the mother of the plaintiff Ralph Bryant.  Mayme Bryant is his wife. They live some distance from each other.  The defendant George E. Brennan was formerly a stock salesman for Henry L. Doherty & Company, and as such purchased certain stock of the Cities Service Company for all of the plaintiffs.  This stock was not delivered to them, but at Brennan's suggestion and request it was kept in the vault in the Detroit office of Doherty & Company.  Dividends thereon were paid to plaintiffs by checks of Doherty & Co.

About March 15, 1929, Brennan severed his connection with Doherty & Company, and entered the

employ of the defendant Whiting & Company as a stock salesman, and was duly licensed to act as such. Friendly relations existed at that time between Brennan and the plaintiffs. He urged them to permit him to sell their stock in the Cities Service Company and to invest the proceeds in units of the Metal & Mining Shares, Inc. (hereafter referred to as stock), which his new employer was then handling. They consented, and the sale was effected and the purchase made through the New York office of the defendant on March 18, 1929, as appears by its records, "through Mr. George E. Brennan of our Detroit office." On April 2, 1929, the defendant sent to each of the plaintiffs a statement of the dividend payable on April 1, 1929, on the stock purchased, and its check, payable to each of their orders, therefor. While these certificates were not offered in evidence, it appears that they had been indorsed by a former holder in blank, and that plaintiffs' names did not appear thereon. Plaintiffs permitted Brennan to retain these certificates in his possession, and in August, 1929, he sold them and used the proceeds to cover investments made by him. He was discharged by the defendant in August, 1930. When plaintiffs learned of his discharge, they made inquiry of defendant as to their stock, and an investigation followed, resulting in criminal proceedings against Brennan and his conviction. These actions were thereafter brought by plaintiffs to recover from the defendants the value of the stock so converted by Brennan to his own use, and resulted in judgments therefor.

*Sarah E. Bryant Case.*

Sarah E. Bryant testified that on April 10, 1929, Brennan came to her home and gave her the defendant's check for dividend heretofore referred to;

that "I just felt I wanted to know just about how I was standing in the company," and he gave her a statement showing her holdings; that she then—

"asked for my certificates at the same time, and he said they were down in the safe deposit vault of P. H. Whiting & Company. Brennan said, 'I took good care of all the Cities Service stock, and I brought you home up there, and I want to do the same with these if you will leave them there.' I had every confidence he would do what he said he would do;"

that—

"on April 10th, he asked me to sign my signature, I don't know as he made any real statement why he wanted me to sign it, and I signed my name on a blank piece of paper for George Brennan. It was done on my dining room table in the presence of my daughter.

"As near as I can remember, I had approximately $4,000 invested at that time. After that day, I asked Brennan for my stock certificates many times. I never called him very often; I did a few times. He would say, 'I will bring them out.' If he called it would always be after banking hours or too late to get into the office, and he had to do this and had to do that. They were safe. He told me they were safe and I believed him;"

that many times thereafter she asked for her certificates, but he always had some reason for their nondelivery, saying "I will take the best care of them."

On cross-examination she admitted that she had received and cashed personal checks of Brennan which she supposed were for dividends on these units. These came in envelopes with defendant's return address thereon. We are not impressed that

this plaintiff was chargeable thereby with notice that Brennan was using her stock for purposes of his own or that she had knowingly authorized him to do so.

Her daughter, Genevieve A. Pennington, who was present at the time, testified:

"On April 10th a little piece of paper was signed by my mother. I was present. We were sitting in the sitting room and he told my mother he had made the change from Henry L. Doherty & Company to P. H. Whiting & Company and would like to have her signature so that he could show that he had changed her stock from one company to the other, and the paper that she signed her name on was positively blank. I don't remember whether Brennan wrote anything on it there or not. I saw my mother sign her signature on my dining room table. * * * Brennan told my mother she could have her stock certificates any time for the asking, but he just didn't bring them out, that is all I can tell you. He did not tell me why he didn't bring them out."

On the paper referred to by these witnesses, over the signature of Sarah E. Bryant, appears the following:

"4/10/29

"This is to authorize G. E. Brennan to use my 138 shares of Metal & Mining common stock as collateral. It is agreed that I receive 6 per cent. interest on 50 per cent. of the market value which is $1,518. Interest payable monthly 7.59.

"SARAH E. BRYANT."

When Brennan sold the stock of this plaintiff in the Cities Service Company and invested the proceeds in the stock of the Metal & Mining Shares, Inc., he was acting for the defendant in making such purchase; and when the defendant purchased this

stock in its New York office and forwarded it to its Detroit office, it knew that such purchase was made for this plaintiff, and we think a legal duty rested upon it to see to it that the stock so purchased was delivered to her, so that, if not then issued in her name, she might take steps to have it so transferred. Brennan knew that this purchase was not for speculation, and that this plaintiff was ignorant of the manner of handling such transactions. The plaintiff believed, and we think she had a right to believe, that, when Brennan urged that he be permitted to keep this stock in the company's vault, the certificates had been transferred to her. Had they been so transferred, Brennan could not have disposed of the stock. Neither could he have pledged it as collateral to any loans made by him, as it is insisted that the writing above referred to authorized him to do.

Defendant insists that—

"The plaintiffs put their entire reliance on George E. Brennan personally, and none at all on defendant, P. H. Whiting & Company, Inc."

While the record discloses that this plaintiff had confidence in Brennan, it also clearly appears that in all his transactions with her relative to this stock he represented himself to be, and was apparently, acting as the salesman of the defendant. Many purchases of stock are made by personal friends of the salesman who have confidence in his judgment and rely on the statements made by him as to the handling of their securities. But such fact does not relieve the employer from frauds perpetrated by their agents, whose integrity they vouch for.

The bond filed by the dealer with the securities commission is conditioned "upon the faithful com-

pliance with the provisions of this act'' (blue sky law) by him ''and all salesmen registered by him.'' 2 Comp. Laws 1929, § 9790. The purpose of the license ''is to afford protection to any person dealing with a salesman.'' *Timmerman* v. *Bultman*, 253 Mich. 99, 106. The plaintiff dealt with Brennan as a salesman of the defendant, and his fraudulent acts in such dealings are chargeable to it.

The serious question presented is the effect of the writing on the paper over the signature of this plaintiff, above referred to. Courts are, we think, and properly so, strongly inclined to look with suspicion upon testimony tending to impair the effect of a writing. At the time Brennan secured this signature, he was acting as a salesman of the defendant. This plaintiff was dealing with him as such. She had a right to rely on his integrity. A business man might well have insisted on a further explanation as to why the request for her signature should be granted, but that given by her daughter is not so unreasonable that it should be discarded. The trial court, who saw these witnesses on the stand and heard them testify, believed that they were telling the truth, and, in the absence of any testimony contradicting them or affecting their credibility, we feel impelled to so accept it.

In our opinion, the judgment in favor of Sarah E. Bryant should be affirmed.

*Ralph and Mayme Bryant Case.*

The facts applicable to this as well as to the Sarah E. Bryant case have been stated. The plaintiff Mayme Bryant testified that she and her husband received the dividend check from the defendant through Brennan; that Brennan came to their home on April 15th and that—

''He told us after he transferred the stock into the P. H. Whiting & Company (Metal & Mining

Shares, Incorporated), that he wanted us to sign a little card. And he said, 'If you will just put your name here, Mrs. Bryant, and here, Ralph,' he said, 'you sign right below it.' We both signed it. It was a little blank card. He sat there and looked it over and wrote something on it and put it in his pocket. I was friendly with Mr. Brennan at that time in a business way. We had prospered from the Cities Service stock. * * * Brennan just took this little card out of his pocket and asked us to sign it. It was blank, in size about four inches by three inches. We signed the paper because we had confidence in Brennan and he asked us to do it as a matter of business. * * * He said, 'If you will sign this,' the card was in front of him, 'and you, too, Ralph,' and we both signed it, and then he said, 'I will take these down and put them with your certificates down in my—in the vault of the office of the P. H. Whiting Company.' "

She further testified that there was nothing written on the card at that time. When produced in court, it had written upon it, above their signatures, a statement similar to that on the paper signed by Sarah E. Bryant. Her testimony as above was corroborated by that of her husband, Ralph Bryant. They both admitted that they thereafter received checks signed by Brennan personally for, as they thought, dividends upon this stock.

Mayme Bryant as a witness identified a letter written by her to the defendant, reading as follows:

"Detroit, Michigan, September 7, 1930.
"P. H. WHITING & COMPANY.

"Mr. George E. Brennan, being a Cities Service salesman, we bought the first 20 shares of stock April 30, 1928, and at different times until we had 75 shares. When Mr. Brennan left the Cities Service Company (meaning Henry L. Doherty & Company) to become associated with P. H. Whiting &

Company, March 15, 1929, he sold our Cities Service, and put it all in Metals & Mining, Inc., and held the certificates for 425 shares, telling Mr. Bryant and myself he would put them in the Guardian Bank as collateral and gave us $24.92 the first of each month until the stock market crash in November, 1929, when he cut it to $12.46. When I received the notice of change of managers, I called up, or made an appointment with Mr. Fitzpatrick, and when I informed him Mr. Brennan held our certificates, he investigated Mr. Brennan's transactions with P. H. Whiting & Company. Hoping this is a satisfactory outline of my dealings with G. E. Brennan,

"I remain, sincerely,

"MAYME BRYANT,

"4844 Helen avenue."

A quite similar letter to the defendant, bearing the same date, was also written by the plaintiff Ralph Bryant. The statements in these letters clearly show that these plaintiffs understood that they were permitting Brennan to retain possession of their stock for the purpose of personal use by him as collateral to loans which he might make in the bank. Clearly, the defendant is not liable for the conversion of it by him to his own use.

The judgment in favor of these plaintiffs is reversed and set aside, and the cause remanded with direction to enter a judgment for the defendant.

As the same attorneys appear in both cases in this court, no costs in either case will be allowed.

McDONALD, C. J., and CLARK, POTTER, NORTH, FEAD, WIEST, and BUTZEL, JJ., concurred.