JERRY BYERS et al., minors, by BEULAH BYERS, next friend, appellees, v. LESTER A. BYERS et al., appellants; WAUNETA BREWER et al., intervenors-appellees.

No. 47792.

(Reported in 46 N.W.2d 800)

MARCH 6, 1951.

Hoegh & Meyer and W. W. Bulman, all of Chariton, for appellants.

A. V. Hass, of Chariton, for appellees.

BLISS, J.—Nathan N. Byers died intestate July 12, 1949, at the age of ninety-five years, leaving no widow, but survived by a son, the defendant, Lester A. Byers, and children of a deceased daughter, Mabel Wells, all of whom are defendants, and also survived by children and grandchildren of Clyde L. Byers, deceased, all of whom are either plaintiffs or intervenors. Clinton Byers, deceased, a son of Clyde L. Byers, is the father of the grandchildren. Martha J. Byers, wife of Nathan N. Byers, died March 24, 1942.

The suit went to trial upon the amended and substituted petition of plaintiffs, which pleading the intervenors adopted, the amended answer of the defendants, and the reply of plaintiffs and intervenors. Plaintiffs and intervenors alleged that: on the death of Nathan N. Byers he was the owner of the North Half of the Northeast Quarter of Section 18, Township 73 North, Range 20 West of the 5th P.M., except four acres conveyed therefrom to the state of Iowa for highway purposes; the names and relationship to the deceased of all his heirs, and the specific undivided interest of each in said land; the undivided interest therein of the defendant, Lester A. Byers, was one third, although he claimed fee simple title to the said land by virtue of

a warranty deed thereto naming him as grantee, and executed by Nathan N. Byers on December 17, 1943, and placed in escrow with his attorneys, Enos A. Anderson and Lucile M. Anderson, husband and wife, for delivery to the grantee, Lester A. Byers, on the death of Nathan N. Byers; when said deed was so delivered in escrow, Nathan N. Byers never relinquished control thereof, but executed and delivered to the escrow holders the following direction, over his signature, typewritten upon the envelope containing the deed, to wit, "December 17, 1943. The within deed of conveyance by Nathan N. Byers is hereby delivered to E. A. Anderson and Lucile M. Anderson, Attys. to hold in escrow and to be delivered to Lester A. Byers upon my death unless sooner called for by me." The petition further alleged that after the death of said E. A. Anderson and after the death of Nathan N. Byers, the said Lucile M. Anderson handed the deed to the defendant, Lester A. Byers, who accepted it after Lucile M. Anderson had materially altered the deed by typewriting into it, as an exception from the land described therein, a description of the portion conveyed for highway purposes; that after said alteration was made the deed was delivered by Lucile M. Anderson to Lester A. Byers, who had it recorded; and that said alteration and delivery were illegal, and the deed conveyed no title to the grantee named therein.

Defendants in their answer as amended admitted the relationship of all parties to the deceased was as alleged in the substituted and amended petition, and the execution and delivery of the deed in escrow and the written directions under which it was held, and admitted the delivery of the deed to Lester A. Byers. They further answered that the execution by Nathan N. Byers of the said deed of December 17, 1943, conveying the eighty acres to Lester A. Byers, and the delivery of the deed in escrow, was the result of a voluntary family settlement between Nathan N. Byers and certain of his heirs, the beneficiaries of which were Mabel Wells, his daughter, Clyde L. Byers, his son, Clinton Byers, his grandson, and the defendant, Lester A. Byers, which settlement was made because of the alleged payment by Nathan N. Byers of certain promissory notes of Clyde L. Byers and Clinton Byers.

Defendants alleged that Lester A. Byers was the absolute owner of the land so deeded. For further answer defendants alleged that: after the death of E. A. Anderson on *November 7, 1945,* Nathan N. Byers modified the written escrow instructions, set out above, by "repeatedly" stating to Lucile M. Anderson, the surviving holder of the escrow, that he did not wish the deed returned to him but that he wished her to deliver it after his death to Lester A. Byers; and that after Lester A. Byers, on July 28, 1949, had accepted and received said deed "Lucile Anderson, who was then his legal and business adviser," made the aforesaid alteration in the deed, and said defendant on the same day had the deed recorded. The prayer of the answer was that title to said land be quieted in Lester A. Byers.

(Note. The date *November 7, 1945,* alleged in the answer as the time of the modification of escrow instructions, is erroneous. It was on that date that E. A. Anderson died. The date of the alleged modification as shown by the testimony of Lucile M. Anderson was in March 1946.)

Lucile or L. M. Anderson had been named as a defendant in plaintiffs' amended and substituted petition. On April 20, 1950, the day before the trial started, she moved that she be dismissed as a party defendant because she neither claimed nor had any interest in the land, and that any possible cause of action against her would be for damages because of altering the deed, which injured no one, and any such action could not be joined in a partition suit. The court sustained the motion.

The land involved in this suit (the North Half (N½) of the Northeast Quarter (NE¼) of Section 18, Township 73 North, Range 20) was acquired jointly in 1885 by Nathan N. Byers and Harvey L. Byers, and the latter conveyed an undivided interest therein to Nathan N. Byers in 1895. This eighty acres is referred to in the record as the "home place." Later Nathan N. Byers acquired the South Half (S½) of the Northwest Quarter (NW¼) of Section 17, Township 73, Range 20, which cornered with the "home place", and also the Southwest Quarter (SW¼) of the Northeast Quarter (NE¼) of Section 17, and the Northwest Quarter (NW¼) of the Southeast Quarter (SE¼) of said Section 17. These four forty-acre tracts, comprising one hundred sixty acres, formed an L-shaped tract with three forties running

east and west and one forty adjoining the most easterly forty on the south. This entire tract is referred to as the "160." On or about August 11, 1945, Nathan N. Byers and Lester A. Byers jointly bought from the referee of the Martha J. Byers (deceased wife of Nathan N. Byers) estate the North Half (N½) of the Southwest Quarter (SW¼) of Section 23, Township 73, Range 21, except railroad right of way, for $6800, of which $4100 was paid in cash and the balance was financed through the Federal Land Bank of Omaha and the Land Bank Commissioner. It was located about two and one-half miles south and west of the "home place." Nathan and Lester each owned an undivided one-half interest in this seventy-five acres at the time of Nathan's death. In the record it is referred to as the "railroad eighty."

Until his death on July 12, 1949, Nathan N. Byers lived on the "home place", and operated it and the "160" by tenants. The "railroad eighty" in Section 23 was operated by himself and Lester A. Byers as a partnership. Nathan N. Byers had the use of the land in controversy from the time the deed thereto was placed in escrow until his death. The probate inventory of his estate shows the estimated value of the "160" at $3200, and that of the half interest in the land in Section 23 at $3870. The personal property is valued at approximately $3000 before deduction of debts and expenses. The land in controversy is listed in schedule IV as land conveyed to Lester A. Byers, in contemplation of death, and its value is put at $8000.

I. We find no evidence which tends to establish the allegation of defendants' answer that the deed of December 17, 1943, which was placed in escrow, was executed as the result of or in fulfillment of any settlement in the Nathan N. Byers family, or among his heirs, or between him and any of his heirs. There is no evidence whatsoever of any meeting of any kind between or among any of those persons for such a settlement.

Lester A. Byers stayed with his father from April 19, 1949 until his death about three months later. After his father's death he told the administrator that his father's desk should be cleaned out, and he then took time to go through the papers and letters. The administrator went through some of them with him, and Lester went through the rest himself. Those which were not thought important were burned. None of the other heirs was

present during any of the search. About a dozen promissory notes were produced by defendants at the trial. Most of them bore dates between February 19, 1901 and February 3, 1908. About half of them bore the signatures of C. L. Byers and N. N. Byers. There was nothing on the face of these notes, nor was there any evidence, as to whether one or both signers were primarily liable. Three notes bore only the signature of Clyde or C. L. Byers, one of which for $190, bearing date of February 1901, was payable to N. N. Byers. The remainder of the notes was payable to banks. On the backs of several notes payments of principal and interest are shown. On one note was an endorsement of $90 by N. N. Byers. There was no indication, except one or two small endorsements, as to who paid these notes. To say that these notes executed thirty-five and more years before the execution of the escrow deed had any connection therewith or that they were a part of any family settlement would be the merest conjecture. There was a note signed by C. L. Byers and Ronald Byers payable to the Iowa State Savings Bank of Knoxville, bearing date of February 1, 1939, stamped "paid" by the bank, with several payments shown on the note, but there is nothing to indicate who paid any part of the note. By these notes the defendant, Lester A. Byers, contends by inference that the father gave the "home place" to him because of advancements made to Clyde Byers and his son, Clinton. But the father made no attempt to benefit Mabel Wells or her children by a conveyance of property such as he made to Lester. Nathan died intestate as to the "160" and the forty acres in the "railroad eighty" in Section 23. If Nathan N. Byers had any family settlement in mind it would likely have included and involved all his heirs and not just Lester. Unless the alleged modification of the escrow instructions was made the 80 acres involved herein was also intestate property.

II. In further support of the family settlement theory, defendants offered the testimony of four witnesses who told of purported declarations or admissions of Nathan N. Byers respecting proposed distributions of his real estate. One of these was the witness, Finch, who had lived on the line between Lucas and Marion Counties north of the Byers property since about 1927. He testified that one morning in 1947, between January and

March, he went to see Nathan N. Byers about renting a softball field on the east side of highway 14, on part of the eighty acres on which Mr. Byers lived. He said there was no one present but Mr. Byers and himself, and in response to an inquiry Mr. Finch answered: "Why he said Less was in California at that time and was coming home and he didn't want to give us any answer in regard to it until Lester came home." After two or three leading questions as to why Mr. Byers wished to wait until Lester came home from California the witness replied: "He said that he intended for Less to have the place there and he didn't want to lease us the ball park without Lester's consent."

Although the witness called on Mr. Byers to see about renting the ball park, on cross-examination he told how Mr. Byers elaborated in detail just what disposition he was going to make of his property among his children. He testified:

"That is the only time that I ever had to talk to Mr. Byers with regard to the place. At that time he simply made a statement that he intended for Less to have the place. He didn't say whether or not he intended to make a will or whether he intended to make a deed or whether he had already done anything about that. With regard to his other property he said, 'I intend for Less to have this'—that is the eighty acres—and that is the home eighty. He said: 'I intend for Less to have this and I intend for Mabel's children to have the eighty up south. I intend for Clyde's children to have the land that lays across the road.' The railroad eighty is the south one. At the same time he was talking about his intention for Less to have the home eighty he went ahead in that conversation and told me the eighty up south was to go to certain of his heirs. He intended Mabel's children to have the railroad eighty. I suppose it is located in English Township. At the time I was talking with Mr. Byers we were on the eighty acres where he lived. That eighty acres corners the one hundred sixty on the southeast that he said he intended Clyde's children to have. The railroad eighty is the one he talked about being up south. He said it was his intention to have it go to Mabel's children. Mabel was a daughter of his. I take it for granted that he told me this other because he told me he intended for Less to have that eighty. I suppose he finished

the conversation by saying he intended Mabel and Clyde's children to have the other. This conversation was had between January and March, 1947. He made no statement at that time as to what instruments he intended to prepare or what he had done with reference to seeing that his intentions would be carried out."

This court has many times commented on the infirmities, inherent in, and incident to, testimony of this kind, and of the dearth of its probative value. The testimony of this witness is illustrative of the soundness of these pronouncements. This claimed conversation was three years before the witness testified. Nathan Byers was then living on the place and using it just as he had since he acquired it. There is no evidence that he ever asked Lester's permission for any use that he made of the property. It is very improbable that he did. Its use as a softball field was just a temporary one, for just that season, no doubt. There is no evidence that Nathan had ever told any of his children he intended that "Less" should have this "eighty" or that any of them should have any particular part of his land. He had never, so far as the record shows, told Lester that he was to have this eighty or any other part of his real estate, and he had many opportunities to do so. When Mrs. Anderson gave Lester the envelope and he opened it on July 28, 1949, according to his own testimony, he said: "Well, this is a surprise to me. Well, I wasn't expecting anything like this." Why would Nathan Byers disclose to a passing acquaintance the particular distribution of his land which he intended to make among his heirs, when, so far as the record shows, he had never made such disclosure to any of them? Another significant matter is that Lester was not in California "between January and March 1947", but he was living right there on the eighty, the "home place", with his father during all that time. He testified: "I had received a letter that my father was poorly and that I had better come home. So I came back home and I spent the winter here *from November 8, 1946 until April 21, 1947.*"

Lester's "surprise" when he looked at the deed is hardly indicative that it was executed as a part of a "family settlement."

Another witness for Lester was Tom Lemig, a carpenter

living in Knoxville, who had lived in the Byers neighborhood for many years. He testified:

"I had a conversation with Nathan Byers on or about July, 1948, at his home about three quarters of a mile south of Belinda. No one was there but me and Mr. Byers. It was in the evening. I always liked to stop and talk to Nate and I stopped and visited with him a half hour or so, and we talked about Less, if Less was still in California—he said he was and he was looking for Lessie back before long. He said, 'I aim for Lessie to have the home place.' We just visited like old friends. I have known him all of my life. When I asked him, 'Is Less still in California?' He said, 'Lessie is coming back before long.' He said, 'I aim for Lessie to have the home place.' * * * He didn't say whether it was his intention to make a will or any other instrument that would fix the title to the place in Lester. He just said he aimed for Lessie to have the home place. He didn't mention any papers of any kind."

Lemig's testimony is also typical of the weakness of testimony of like kind. The purported conversation took place in July 1948. Why should Nathan Byers tell Lemig about the deed when he had never told Lester or any other heir? If the modification of the escrow delivery had taken place in March 1946, as testified to by Mrs. Anderson, when the delivery of the deed to Lester became irrevocable and conclusive, and when Mrs. Anderson said to Nathan Byers, "Do you realize you can't get it back without a court order or some authority?", wouldn't Nathan probably have said to Lemig that he had already given a deed of the "home place" to Lessie, instead of saying that he "aimed" in the future for Lessie to have the "home place?" The same query is pertinent to the testimony of Finch. Lemig's testimony is similar in another respect to the Finch testimony. Lester was not in California in July 1948, but he was with his father on the home place at that time. Lester testified that after his return to California on April 21, 1947, "I came back in February 1948 and stayed until October 22, 1948."

Lester made many trips from California back to his old home in Lucas County—in 1939, 1941, 1944, 1945, 1946, 1947, 1948—and he came back on April 19, 1949 and stayed until his

father passed away. Speaking of his father during this last period, Lester testified: "He was not sick. He was able to take care of himself during the last four months and I was a companion to him the last months of his life." Nathan had many opportunities to tell Lester about the deed and about the modification of the escrow agreement of March 16, 1946, if any was made, particularly during the days of their last companionship, but he never did. A pertinent query is, "Did he tell Finch, or Lemig, or Mrs. or Mr. Rinehart?"

Marie Rinehart was a witness for Lester. She and her husband moved from Newton to Red Rock in February 1948. Nathan Byers was her uncle, whom she visited three or four times a year. She and her husband, Marion Rinehart, had been at Columbia, a village in Marion County, just north of the Byers home. She testified:

"I visited Nathan N. Byers on December 14, 1943, with my husband * * *. It was along in the evening, about 3:30 or 4:00 * * *. He was in good physical condition. * * * We talked to Mr. Byers about the home eighty. He brought up the subject about the home place. He said he was going to give the home— he was going to see that Less got the home eighty and that he had been to Chariton the day before to see about the papers and he was going back next Tuesday and have them finished up. * * * That was the only time he said anything about the home eighty and the only time I ever said anything to him about it. * * * He didn't say he was going to do it by will or by deed. He just said he was having the papers fixed. That was the last talk I had with regard to that. Subsequent to this conversation he never told me what kind of papers he had drawn or whether he ever had any drawn. He said there had been a number of times he had let the rest of them [the grandchildren] have a share of the crops to help them out. That he had never helped Lester. Lester had been gone."

Marion Rinehart testified just as his wife had. He apparently thought the old gentleman was rambling somewhat, as he testified: "I tried to get him off the subject, but he just kept on * * * and finally got off the subject." Assuming these conversations took place and at the time stated, they are of little help to

either side. It is established that Nathan did execute the deed in question at or about that time in Chariton. They testified over six years later, and their memory was remarkable as to details. Each remembered the year, the day of the month, the day of the week, the hour of the day, and that "he was going back next Tuesday and have the papers finished up" at Chariton. According to their testimony Nathan had been to Chariton the day before, Monday the 13th, and he was going back the next Tuesday, December 21st. He apparently changed his mind and returned to Chariton on Friday, December 17th. But during the years that followed in their three or four visits annually he never mentioned the matter again or told them of the deed transaction, or of making certain that Lester received title to the land by modification of the escrow arrangement in March 1946.

Lucile M. Anderson practiced law with her husband, E. A. Anderson, in Chariton. She was admitted to the practice of law in 1937. Her husband died November 7, 1945 and she carried on the practice thereafter and was so engaged on July 12, 1949 when Nathan Byers died. As a witness for plaintiffs she identified the escrow deed and envelope and the signature of Nathan N. Byers on the latter, and testified that they had always been in their office safe since the deed was executed, and that after delivery of the deed to Lester A. Byers on July 28, 1949, she, as his legal adviser, changed the deed by inserting therein a clause excepting from the conveyance the tract conveyed to the State of Iowa for highway purposes. On cross-examination, much of which was objected to as not proper cross-examination—with which objection the trial court agreed, but the testimony was all repeated as a witness for defendant and we will not attempt to separate it—she testified that: she and her husband's daughter were executrices of his estate, and as such sent to Nathan N. Byers sometime in 1946 a statement of his $10 account; later, and in March 1946 as she was leaving the courthouse for her office north of the square, and had crossed the street, she met Nathan Byers near the alley and stopped to visit with him, with no one near; it was a cold day and she told him he should not be standing out; he said he had received the statement but "he just didn't have the money to pay it", and she told him not to worry and that "if we never get it it will be all right." In answer to

quite leading questions and over that objection and that she was an incompetent witness under the "dead man's statute" (section 622.4, Code of 1946, I. C. A.), she testified that she asked him if he remembered leaving some papers in their office and he said that he did, and that she then said to him, "Well, Mr. Anderson is gone now. Do you want me to continue to keep them? and he replied by saying, 'Yes, I want you to keep them, and I want you to see that Lester gets them after my death, and do not give them to anyone else.' Q. Did he say he ever wanted the deed back again? A. He said he never wanted it back. Q. What did you reply to this conversation? A. I said, Mr. Byers, do you realize you are giving me this deed to deliver to Lester? He said, 'Yes, I want it delivered to him.' I said, Do you realize you can't get it back without a court order or some authority? He said, 'Yes, but I don't want it back, I want Lester to have it.'" That terminated the conversation with Nathan Byers, at that time, and she never after discussed the matter with him.

Mrs. Anderson also testified that sometime prior to Nathan Byers' death, and on March 17, 1948, Lester Byers came to her office and paid his father's account, at which time she told him that she had some papers which his father had left for him and that after his father's death he should come to the office and get them; that after his father's death, on July 28, 1949 Lester called for the papers and she gave him the envelope, *"and he sat there a moment and tore open the envelope and looked at the deed"*, and expressed his surprise as hereinbefore stated; that it was then that she corrected the deed and he took it to the courthouse and had it recorded. The envelope shows that it was never torn open and had never been sealed.

On both defendants' direct examination and plaintiffs' cross-examination, Mrs. Anderson testified that she was in the office on December 17, 1943 when Nathan N. Byers called and consulted her husband; that she heard them discussing the matter of the deed, and was present when the deed and the envelope to contain it were prepared by Mr. Anderson, including the escrow instructions on the back of the envelope, and that she knew and understood the nature of them, and that the deed after being drawn was placed in the envelope and both were put in the office safe.

On plaintiffs' cross-examination, Mrs. Anderson, with reference to Exhibit P-2 (the escrow deed) and Exhibit P-2-A (the envelope containing it), testified that after her talk with Nathan N. Byers, on the sidewalk, in March 1946:

"* * * there was never any change made in Exhibit P-2-A, I never took Exhibit P-2-A from the office safe and it remained in the office safe until the date of his death, July 12, 1949. Nathan N. Byers never called at my office to pick up Exhibit P-2 or for the purpose of making any change or picking up the envelope, P-2-A. * * * I did not touch it and he never was there to get it. There was nothing in writing in which Nathan N. Byers made any change in the written language on Exhibit P-2-A by subscribing any other instrument, and I took no steps after our talk in March 1946 to destroy the instructions on Exhibit P-2-A. Neither he nor I attempted to make any change in the written instructions or destroy the writing subscribed on Exhibit P-2-A and it remained as it was until the present date."

Lester A. Byers, as a witness for himself, testified that on March 17, 1948 he went to Mrs. Anderson's office and paid the $10 account of his father, and she said to him, "I have a paper here for you left here by your father", and he told her to keep it there as he did not care to know what it was, since his father had left it to be delivered at his death; that on July 28, 1949 he' called for the paper and she gave it to him and corrected the description and he recorded the deed; that this was the first knowledge he had of the deed or of what it conveyed, and that he had no idea of the paper she was holding in the office. If he received any information from his father about the deed held by the Andersons, or about the disposition of any of his father's property, or of any family settlement or of any modification of the escrow instructions he did not disclose it, and his attorneys asked him no questions about any of these matters. All of the promissory notes of either Clyde L. Byers or of Nathan N. Byers which defendant put in evidence were dated prior to January 1908. Lester A. Byers did not go to California until 1915. If he knew anything about these obligations he did not inform the court and he was not asked. The Rineharts testified that Nathan Byers told them he had never done anything for Lester. He knew

best about this but he said nothing at the trial. If his father told him of the inquiry about the softball field he did not disclose it. Lester was the only living child of Nathan. He was sixty-nine years old at the time of the trial. If he ever was married or had any children it does not appear in the record. Clyde, the only brother of Lester, was two years his junior, and Mabel, their only sister, was about twelve years younger than Lester. Clyde and Mabel and Clinton, an adult son of Clyde, preceded Nathan in death. The only heir other than Lester called as a witness was Ronald Byers, a son of Clyde. He testified that he had farmed the home eighty since 1934 and always accounted to his grandfather, Nathan, for the rents. He lived on and also farmed the one hundred sixty acres. The defendants, other than Lester, were children and grandchildren of Mabel. The plaintiffs were minor children of Clinton Byers, and the intervenors were children or grandchildren of Clyde L. Byers.

III.  We have fairly set out all of the material testimony of Lester and of his five witnesses. His chief witness, and the one upon whom his case almost wholly depends, was Lucile M. Anderson, and the vital part of her testimony was the oral talk she had with Nathan N. Byers on a sidewalk in Chariton on a cold day in March 1946. The other four witnesses testified to verbal declarations or admissions of Nathan. There can be no testimonial contradiction or denial of the testimony of these five witnesses because the lips of Nathan N. Byers, with whom they talked, are sealed in death. Such testimony has been presented to this court many, many times since the court was organized, in various kinds of cases in law, equity, probate, and criminal prosecutions, and just as often the court has announced that such testimony is heard with doubt and skepticism, examined with the closest scrutiny, subjected to the most severe tests which tend to weaken its credibility, and carefully, jealously and cautiously weighed and considered. Some of the reasons why such testimony is uniformly regarded as so dangerous and unsatisfactory are: because of the ease of its fabrication, the impossibility of its controversion, the grievous consequences which may result from the fallibility of human memory, understanding or judgment, and the absence of worldly sanction, since from the nature of such evidence, no witness so testifying could ever be

convicted of perjury. Such testimony is not accepted as conclusive simply because it cannot be directly denied. It must, nevertheless, pass the test of credibility in the light of surrounding circumstances and its inherent probability or improbability, as judged by common experience and the ordinary rules of human conduct in like situations. We note some of the many decisions of this court, with occasional comments, in support of the statements noted above: Boeck v. Milke, 141 Iowa 713, 718, 118 N.W. 874, 120 N.W. 120 (entitled to very little weight); Sharpe v. Wilson, 181 Iowa 753, 768, 161 N.W. 35 (not very persuasive in probative force); Ellis v. Newell, 120 Iowa 71, 73, 94 N.W. 463; Martin v. Town of Algona, 40 Iowa 390, 392 (received cautiously); Butler v. Lloyd, 230 Iowa 422, 429, 297 N.W. 871; Cooper v. Skeel, 14 Iowa 578, 581 ("Than this no species of testimony is more dangerous, or received with greater caution."); Williams v. Harrison, 228 Iowa 715, 722, 293 N.W. 41 (scrutinized with the greatest care, and established only upon the most satisfactory evidence); In re Estate of Rich, 199 Iowa 902, 917, 200 N.W. 713, 719 ("They are seldom anything more than the vague expressions of a witness of what he thinks he has heard another say, stated in his own language, without the qualifications or restrictions, the tone, manner, or circumstances, which attended their original expression."); Garman v. Wettengel, 199 Iowa 1150, 1151, 203 N.W. 266 (belongs to a class which usually challenges the scrutiny and the skepticism of the court); Holmes v. Connable, 111 Iowa 298, 301, 82 N.W. 780, 781 (quoted—" 'It is incumbent on the court to look upon such evidence with great jealousy, and to weigh it in the most scrupulous manner, to see what are the character and the position of the witnesses generally, and whether they are corroborated to such an extent as to secure confidence that they are telling the truth.' "); Peterson v. Citizens State Bank, 228 Iowa 219, 223, 224, 290 N.W. 546; Ross v. Ross, 148 Iowa 729, 733, 127 N.W. 1034, 1035 ("As the alleged vendor is dead and cannot give his version of the matter, it is a wholesome rule of law that the testimony to sustain such a contract * * * must be clear, satisfactory, and convincing."); Benson v. Custer, 236 Iowa 345, 358, 17 N.W.2d 889, 895 ("We have always held that such testimony should be cautiously received and that it is of little weight."); In re Estate of Shinn, 207 Iowa 103, 105,

222 N.W. 569 (should receive the closest scrutiny); Brewer v. King, 212 Iowa 665, 669, 670, 237 N.W. 508; Makinson v. Shumick, 196 Iowa 980-983, 193 N.W. 407; McDonald v. Yellow Taxicab Co., 192 Iowa 1183, 1193-1195, 184 N.W. 291, 294 ("The mouth of the only other person present is closed. Under such circumstances, and under this record, neither the court nor the jury was compelled to blindly believe every word Reed said, and just as he said it."); Newell v. Estate of Newell, 198 Iowa 710, 714, 200 N.W. 238; Watson v. Richardson, 110 Iowa 673, 678, 80 N.W. 407, 409 ("But these cannot, in the nature of things be controverted, and for this reason must be carefully scrutinized, and received, if at all, with caution. * * * Such testimony must necessarily be tested by its own inherent probability or improbability, by comparison with the other evidence in the case, and by ordinary rules of human conduct under similar circumstances."); Helmers v. Brand, 203 Iowa 587, 593-595, 213 N.W. 384; Schulte v. Ideal Food Products Co., 203 Iowa 676, 677, 678, 213 N.W. 431 ("We have consistently held that a mere failure to produce direct contradiction to the testimony of a witness does not necessarily entitle such testimony to be deemed true. It must still stand the test of credibility, in the light of all the circumstances surrounding the transaction."); Stiles v. Breed, 151 Iowa 86, 91, 92, 130 N.W. 376; Bremer v. Haag, 151 Iowa 449, 452, 131 N.W. 667; Markey v. Markey, 108 Iowa 373, 377, 79 N.W. 258; Finger v. Anken, 154 Iowa 507, 511, 131 N.W. 657; Young v. McClannahan, 187 Iowa 1184, 1191, 1192, 175 N.W. 26; Wagner v. Wagner, 208 Iowa 1004, 1009, 224 N.W. 583, 585 ("The testimony of declarations and admissions made by Ellen and John Wagner and all conversations overheard between them is not of high order. * * * Its accuracy cannot be depended upon."); First Trust JSL Bk. v. McNeff, 220 Iowa 1225, 1231, 1232, 264 N.W. 105 (scrutinized jealously and weighed cautiously and its credibility subjected to the most severe tests); Bohen v. North American Life Ins. Co., 188 Iowa 1349, 1354, 1355, 1363, 177 N.W. 706; Brien v. Davidson, 225 Iowa 595, 602, 281 N.W. 150, 282 N.W. 480; Faber v. New York Life Ins. Co., 221 Iowa 740, 746, 747, 265 N.W. 305; Gilmer v. Neuenswander, 238 Iowa 502, 506, 507, 28 N.W.2d 43.

We will examine the testimony of Mrs. Anderson, its setting and background, as admonished by this court in prior opinions. Appellants in printed argument state that "Nathan N. Byers at his death was and had been unable to pay a small attorney fee *which he owed for several years* \* \* \* and in March 1946 he came to Chariton \* \* \* *and apparently waited to see Lucile M. Anderson,* sole surviving trustee, between the courthouse and her office, and talked to her about being unable at that time to pay the fee to Mrs. Anderson." There is nothing in the record to support the italicized words, and that is true of several purported statements in said argument. We have set out the property which deceased had at his death. It is rather strange that the owner of two hundred eighty acres of farm land, only lightly encumbered, with no dependents, was unable to pay a ten-dollar account. Just why he should anticipate her appearance on the street at a particular time and await her there on a cold March day instead of going to her office near by appears unreasonable. She knew the provisions of the escrow agreement and that she was the rightful custodian of the papers, and she knew that he knew those things and no doubt knew of her husband's death, in the preceding November, and had never made any inquiry about the deed. And yet on the street on this inclement day she broached the subject to this 92-year-old gentleman—an important business transaction, the transfer of title and ownership of an eighty-acre farm worth $8000, and completed the transaction there on the sidewalk on a Saturday afternoon in a few minutes without even a memorandum to evidence it. There was no necessity for such careless expedition. It was not a pressing matter. Adults, particularly when one of them is a lawyer, do not transact legal business in that manner. If such a transaction was suggested, either Mr. Byers, the client, or Mrs. Anderson, the lawyer, would have said, "Let's go up to the office", particularly when she had scolded him for standing out in the weather.

When Mr. Byers wished to place the deed in escrow on December 17, 1943, he did not stand on the street and wait for Enos Anderson to pass by, but he went to the Anderson office and had the papers prepared as any client and lawyer would wish them to be prepared. That transaction was relatively unimportant. It was not a conclusive delivery of the deed, it was

but a conditional one, leaving Mr. Byers with the absolute title, since by the recall reservation he retained control over the deed. But the transaction in March 1946 was very important. When he stopped on the sidewalk he owned the farm in fee simple and before he walked on he had irrevocably divested himself of it, subject to his life use of it. It is unreasonable to presume that Mr. Byers would not have insisted upon a writing showing what the transaction was, just as was done on December 17, 1943, and it is incredible that Mrs. Anderson, the lawyer, would not have insisted on a like procedure.

There was no change in the original escrow instructions and no written substituted instructions, and according to Mrs. Anderson neither suggested that either be done. The only evidence of the modification of the escrow agreement as contended for by Lester A. Byers was in the memories of Nathan Byers and Lucile Anderson, and had both of them died at any time after the street talk, all proof of the alleged event would have vanished, and the only evidence of the escrow arrangement would have been the envelope Exhibit P-2-A in the safe in the Anderson office.

When Nathan Byers counseled with Mr. and Mrs. Anderson in December 1943 and the deed and escrow papers were prepared the confidential relation of lawyer and client was effected. It was to be disclosed by the attorneys only with the client's permission. Mr. Byers never told Lester or anyone else of the escrow transaction. No doubt he had his own reasons for not telling Lester. The Andersons, after the transaction of December 17, 1943, held the papers as agents and trustees of Nathan Byers, because of the recall reservation. While not disclosing the nature of the papers, she did tell Lester his father had left a paper with them to be delivered to Lester after the father's death. The fact that she became Lester's legal adviser is a matter for consideration in weighing her testimony.

IV. As we have noted herein, the alleged transaction of March 1946 effected a transfer of the title and ownership of the land here involved from Nathan to Lester A. Byers by oral words alone. Of a similar claim, the court in Freeborn v. Servis, 182 Iowa 1350, 1352, 165 N.W. 178, said: "Such a claim is easily made, and is difficult to disprove. It therefore calls for great scrutiny, and we have considered the claim herein with some

skepticism." In Freeseman v. Henrichs, 233 Iowa 27, 28, 6 N.W.2d 138, 139, we held: "On many occasions we have said that, in order to enforce an oral contract * * * more than a bare preponderance of evidence is required. The evidence must be clear, convincing, and satisfactory." In Sinclair v. Allender, 238 Iowa 212, 221–224, 26 N.W.2d 320, 326, the court quoted from Noel v. Noel, 1 (Clarke) Iowa 423, 425: " 'It is contrary to every correct principle, that the legal title should be divested upon parol testimony, which is not clear, satisfactory, and distinct.' " And on page 225, this court said: "Testimony of one which cannot be contradicted must be received with caution, carefully weighed, and any reasonable doubts resolved against it."

Nathan N. Byers held the legal title to the land and the escrow deed was in his control at the time of the alleged talk with Mrs. Anderson on the street, by which she testified that he divested himself of title. Proof of such divestment cannot be established except by testimony which is clear, satisfactory and convincing. A preponderance of evidence is not sufficient. Thompson v. Thompson, 240 Iowa 1162, 1172, 1173, 39 N.W.2d 132; Wagner v. Wagner, 208 Iowa 1004, 1009, 224 N.W. 583.

For other authority respecting the high order of proof necessary to prove a parol modification of written instruments, including escrow instructions, see Kula v. Kula, 149 Neb. 347, 31 N.W.2d 96; Stevens v. Stevens, 256 Ill. 140, 99 N.E. 917; Kavanagh v. The Golden Rule, 226 Minn. 510, 33 N.W.2d 697; Bryant v. Whiting & Co., 261 Mich. 561, 246 N.W. 497, 499; 23 C. J., Evidence, section 1760, page 26; Anderson v. Aetna Life Ins. Co., 193 Iowa 1037, 1038, 188 N.W. 883; McKenney & Seabury v. Nelson, 220 Iowa 504, 506, 262 N.W. 101. The evidence of defendants is not of the quality or quantity required by the decisions of this court, or of authorities generally, to prove the modification of the original escrow writing.

V. Although Mrs. Anderson was present and participated in the making of the escrow arrangement on December 17, 1943 and heard the matter discussed by her husband and Mr. Byers, she did not testify to the express purpose or intention of the latter, or of any advice or statement of the pertinent law which her husband, no doubt, made to Mr. Byers. For many years there was a lack of harmony in our decisions as to what effected a

valid delivery of a deed which had been placed in a safe-deposit box over which the grantor maintained control, or one which had been placed with another for delivery to the grantee, but with the reservation of the right to recall the deed by the grantor during his lifetime. In Davis v. John E. Brown College, 208 Iowa 480, 222 N.W. 858, the grantor left the deeds with a bank for delivery to the grantees but subject to the right of the grantor to demand their return. The grantor died without recalling the deeds and this court held the delivery was valid. Under a like state of facts the delivery of the deed was held valid in Boone Biblical College v. Forrest, 223 Iowa 1260, 275 N.W. 132, 116 A. L. R. 67. In Orris v. Whipple, 224 Iowa 1157, 280 N.W. 617, 129 A. L. R. 1, the delivery of the deed was attempted by leaving it in the grantor's safe-deposit box, over which grantor had control, where the deed was found on her death. This court reversed the trial court's decision that such a delivery to the grantee was valid, and also overruled Davis v. John E. Brown College and Boone Biblical College v. Forrest, both supra. The decision in the Orris case was made in 1938.

Since Mr. Byers deposited the deed with the Andersons "to hold in escrow and to be delivered to Lester A. Byers upon my death unless sooner called for by me", it may be inferred therefrom that he had not definitely determined that Lester was to have the land, and that he reserved the choice of making other disposition of it. In the absence of any evidence to the contrary we may assume that the Andersons had knowledge of the decision in the Orris case, and advised Mr. Byers that such an escrow arrangement did not divest him of title and that if so continued until his death the deed would not convey title to Lester but would be void, and the land if not otherwise disposed of would be part of his estate for distribution under the statutes of descent to his heirs.

Mr. Finch testified that Nathan N. Byers was going to make a distribution of his real estate so that his son Clyde's heirs would receive the one hundred sixty acres, and Mabel's heirs would receive the undivided one half of the forty acres in Section 23, and that Lester would receive the "home eighty." If Nathan Byers did tell Finch of this proposed distribution, or if he had such plan, he did not make it effective as to the heirs of either

Clyde or Mabel, and he may have decided not to make it effective as to Lester, and to let all his real estate and personal estate descend under the statutes of distribution, as intestate property.

The testimony of Mrs. Anderson respecting the modification of the escrow arrangement is so out of the ordinary and is so far from being clear, convincing or satisfactory, that it carries no conviction to this court of the actuality of such modification. That was the conclusion of the able and experienced trial court and it is entitled to much weight.

VI. When a deed has been duly executed and recorded it is presumed to have been delivered. This presumption is, of course, rebuttable, but those who attack its delivery must overcome this presumption by clear and satisfactory evidence. Jones v. Betz, 203 Iowa 767, 768, 210 N.W. 609; Huxley v. Liess, 226 Iowa 819, 823, 285 N.W. 216; Witt v. Witt, 174 Iowa 173, 175, 156 N.W. 321 (clear and convincing). In other cases we have used the words clear, satisfactory and convincing. Ferrell v. Stinson, 233 Iowa 1331, 1336, 11 N.W.2d 701; Hodgson v. Dorsey, 230 Iowa 730, 733, 298 N.W. 895, 137 A. L. R. 456. The omission or addition of any one or two of the words effects little change in the meaning. In Stiles v. Breed, 151 Iowa 86, 90, 91, 130 N.W. 376, 378, the court said: "Of course, the presumption is rebuttable, and may be overcome by any satisfactory evidence. It is evidently based on the notion that, as only instruments duly delivered are recordable, such delivery should be inferred, rather than the surreptitious act of handing a deed never delivered to the recorder." Circumstances may overcome the presumption (Brien v. Davidson, 225 Iowa 595, 603, 281 N.W. 150), and the clear and satisfactory proof is made when facts to the contrary are established (Dyson v. Dyson, 237 Iowa 1285, 1288, 25 N.W.2d 259).

Inasmuch as the recording was effected through a delivery secured by a modification of the escrow instructions which we hold was not established, we also hold that the presumption of delivery was overcome by clear, convincing and satisfactory evidence.

Appellees argue some other propositions in support of the decree, but it is not necessary that we pass on them.

The judgment and decree is—Affirmed.

WENNERSTRUM, C. J., and GARFIELD, OLIVER, SMITH, HAYS, and THOMPSON, JJ., concur.

MULRONEY, J., concurs in result.

MANTZ, J., not sitting.